Hillsborough-northern judicial district
Nos. 2006-043
 2008-442

THE STATE OF NEW HAMPSHIRE

v.

SCOTT W. VEALE

Argued: March 12, 2009
Opinion Issued: May 1, 2009

*Kelly A. Ayotte,* attorney general (*Nicholas Cort,* assistant attorney general, on the brief and orally), for the State.

*Getman, Stacey, Schulthess & Steere, P.A.,* of Bedford (*Andrew R. Schulman* on the brief and orally), for the defendant.

HICKS, J. The defendant, Scott W. Veale, appeals orders of the Superior Court relating to its finding that he is incompetent to stand trial. We affirm.

The relevant facts are as follows. The defendant is a real estate broker who has been involved in various land and logging disputes for many years. He was indicted in June 2003 for one count of timber trespass, *see* RSA 227-J:8-a (2000), and one count of theft by unauthorized taking, *see* RSA 637:3 (2007), after a property owner alleged that he cut and removed oak timber from the owner's property. The court appointed a public defender to represent the defendant. A second public defender entered an appearance to assist in the defense because of his familiarity with real estate issues.

The attorney-client relationship deteriorated over the following months. The defendant believed that he owned the timber and the property. He also believed that local and State authorities prosecuted him as part of an ongoing conspiracy to deprive him of property rights. The public defender conferred with two real estate attorneys to determine whether the defendant's claim had merit. Both concluded that it did not. The defendant, however, continued to insist that the public defenders seek funds for a property survey. Eventually, the defendant accused the public defenders of being part of the conspiracy against him and his family. This severely impaired communication and the public defenders concluded that he was unable to assist in his defense.

In July 2004, defense counsel filed a motion to determine competency. Dr. James Adams, a psychiatrist, examined the defendant in November 2004 and ultimately determined that, although the defendant suffered from a paranoid disorder, he was competent to stand trial. Defense counsel moved for, and were granted funds for, a second opinion. Dr. Philip Kinsler, a clinical and forensic psychologist, examined the defendant in March 2005 and concluded that he suffered from a delusional disorder and was incompetent.

The defendant filed a *pro se* motion in July 2005 summarizing the breakdown of communication with his appointed counsel, outlining their disagreement over "the need for a mental evaluation," requesting a finding that such evaluation was unnecessary, and requesting new counsel. The clerk refused these pleadings "under Superior Court Rule 5 for non-compliance with Rule 15." He noted that "[o]nly pleadings submitted by attorneys of record or parties who have filed a pro se appearance . . . may be accepted." The clerk instructed the defendant to contact either of his appointed counsel "for advice on the procedure for presenting . . . concerns to the Court."

The Superior Court (*Barry*, J.) held a competency hearing in September 2005, receiving testimony from each doctor. The State conducted the direct examination of Dr. Adams and cross-examination of Dr. Kinsler. The public defender conducted the direct examination of Dr. Kinsler and cross-examination of Dr. Adams. The court also made limited inquiry. The

636

defendant was present at the hearing but did not testify. At a later hearing, the public defenders could not recall whether the defendant ever requested to testify at the competency hearing; the defendant's current counsel represented to the court at that hearing that the defendant made no "specific demand to [the public defender] to take the stand and testify."

The court ultimately found the defendant incompetent to stand trial and ruled that he could not be restored to competency. The court later held a hearing on dangerousness, ruled that the defendant was not dangerous and granted the defendant's motion to dismiss the criminal charges.

The defendant filed a *pro se* notice of appeal raising several issues. *See State v. Veale*, 154 N.H. 730, 731 (2007). We appointed the appellate defender to represent him on appeal. *Id.* The appellate defender moved to withdraw, citing a conflict of interest due to an ineffective assistance of counsel claim alleged against the public defenders. *Id.* We stayed the appeal and remanded the ineffective assistance claim in order to allow the trial court to rule on it in the first instance. *See id.* at 737.

On remand, the trial court appointed the defendant's current counsel. Counsel filed an amended ineffective assistance claim and a motion to vacate the competency finding. The motion alleged a denial of procedural due process. After a hearing, the Trial Court (*McGuire*, J.) ruled against the defendant on the ineffective assistance of counsel claim and denied his motion to vacate the finding of incompetence. The court noted that defense counsel was ethically bound to raise the competency issue and that such action did not deprive the defendant of procedural due process.

We appointed the defendant's trial counsel to represent him on appeal and granted the appellate defender's motion to withdraw. The defendant appeals only the denial of his motion to vacate, arguing that he was denied due process in the competency determination. He cites the Due Process Clauses of the Fourteenth Amendment to the Federal Constitution and Part I, Article 15 of the State Constitution. We first address this argument under the State Constitution and cite federal opinions for guidance only. *State v. Ball*, 124 N.H. 226, 231-33 (1983). "Because this issue poses a question of constitutional law, we review it *de novo*." *State v. Hall*, 154 N.H. 180, 182 (2006).

Part I, Article 15 of the State Constitution provides, in relevant part: "No subject shall be . . . deprived of his property, immunities, or privileges, put out of the protection of the law, exiled or deprived of his life, liberty, or estate, but by the judgment of his peers, or the law of the land . . . ." N.H. CONST. pt. I, art. 15. "Law of the land in this article means due process of law." *Petition of Harvey*, 108 N.H. 196, 198 (1967) (quotation and ellipsis omitted).

■ "The ultimate standard for judging a due process claim is the notion of fundamental fairness." *Saviano v. Director, N.H. Div. of Motor Vehicles*, 151 N.H. 315, 320 (2004). "Fundamental fairness requires that government conduct conform to the community's sense of justice, decency and fair play." *Id.* Our threshold determination in a procedural due process claim is "whether the challenged procedures concern a legally protected interest." *State v. McLellan*, 146 N.H. 108, 113 (2001) (quotation omitted); *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005).

Undoubtedly, the state constitutional right to due process protects defendants from standing trial if they are legally incompetent. *See State v. Zorzy*, 136 N.H. 710, 714 (1993); *State v. Champagne*, 127 N.H. 266, 270 (1985). The defendant's due process challenge, however, does not implicate this right. Indeed, the competency proceedings below resulted in a dismissal of the two indictments, and resulted in no confinement because the defendant was found not to be dangerous. *See* RSA 135:17-a, I, V (2005) (amended 2006). The defendant grounds his due process challenge on the stigma attached to his reputation by virtue of the incompetency finding. He argues that, while the competency proceedings may have protected his right not to be tried if incompetent, they erroneously imposed upon him an "indelible stigma" affecting the exercise of various civil rights. It is through this lens that we consider his procedural due process challenge.

The State contends that the defendant's asserted reputational interest fails to trigger a due process analysis because he simply "speculates about a number of potential consequences that 'may' or 'can' flow from a finding of incompetence," rendering each "too speculative and remote to constitute the kind of liberty or property interest contemplated by the constitution."

The State would have a stronger argument if we had adopted the analysis in *Paul v. Davis*, 424 U.S. 693 (1976), under our State Constitution. In *Paul*, the Supreme Court coined what would later be known as the "stigma plus" test. *See, e.g., Hawkins v. Rhode Island Lottery Com'n*, 238 F.3d 112, 115 (1st Cir. 2001). The Court noted that "[t]he words 'liberty' and 'property' as used in the Fourteenth Amendment do not in terms single out reputation as a candidate for special protection . . . ." *Paul*, 424 U.S. at 701. It narrowed its prior holding in *Wisconsin v. Constantineau*, 400 U.S. 433 (1971), by concluding that defamation alone could not constitute an interest triggering due process protection. *Id.* at 708. Instead, the Court read *Wisconsin* as recognizing a cognizable right warranting due process protection where reputational stigma exists in addition to state action altering or extinguishing "a right or status previously recognized by state law." *Id.* at 711. In *Siegert v. Gilley*, 500 U.S. 226, 234 (1991), the Court extended the doctrine by requiring, in addition to the stigma, a *contemporaneous* tangible loss.

We, however, have never adopted the stigma-plus test as the touchstone for procedural due process under the State Constitution. In *Richardson v. Chevrefils*, 131 N.H. 227, 234 (1988), we cited *Paul* and recognized, in the context of qualified immunity, that "it is settled law that personal reputation is neither a liberty nor a property interest cognizable under the fourteenth amendment." We conducted no separate state constitutional due process analysis. *Richardson*, 131 N.H. at 234. Although other cases have approached the issue, they have merely assumed that state constitutional due process attaches to a reputational right. *See Petition of Preisendorfer*, 143 N.H. 50, 53 (1998) (stating that asserted stigmatization from being placed upon a central registry of sex offenders was no greater than a professional interest for purpose of procedural due process); *In re Tracy M.*, 137 N.H. 119, 124 (1993) (assuming that "liberty interest in . . . standing in the community" was coextensive with the interest in the parent-child relationship for purposes of procedural due process). Accordingly, the issue remains open under the State Constitution.

Although we do not necessarily agree with all of the scholarly criticism of the stigma-plus doctrine, we are mindful that constitutional scholars have not received the doctrine well. *See* Mitnick, *Procedural Due Process and Reputational Harm: Liberty as Self-Invention*, 43 U.C. DAVIS L. REV. ___, ___ nn.3 & 5 (forthcoming 2009) (collecting scholarly articles criticizing *Paul* and its progeny). By requiring that a separate liberty or property interest accompany the reputational injury, the decision in *Paul* marked a drastic narrowing of its predecessors. In our view, *Paul* effectively relegates the reputational interest to insignificance because the separate injury would, itself, often invoke the Due Process Clause. *See Petition of Preisendorfer*, 143 N.H. at 53; *In re Tracy M.*, 137 N.H. at 124.

 "Although in interpreting the New Hampshire Constitution we have often followed and agreed with the federal treatment of parallel provisions of the federal document, we never have considered ourselves bound to adopt the federal interpretations." *Ball*, 124 N.H. at 233. In *Clark v. Manchester*, 113 N.H. 270 (1973), we concluded that a probationary employee was not entitled to due process, in part, because he failed to show "that the governmental conduct likely will . . . seriously damage his standing and associations in the community . . . [or] impose a stigma upon the employee that will foreclose future opportunities to practice his chosen profession." *Clark*, 113 N.H. at 274 (quotation omitted). In *Petition of Bagley*, 128 N.H. 275, 284 (1986), we stated that "[t]he general rule is that a person's liberty may be impaired when governmental action seriously damages his standing and associations in the community." We also "recognized that the stigmatization that attends certain *governmental determi-*

nations may amount to a deprivation of constitutionally protected liberty." *Bagley*, 128 N.H. at 284. Thus, we find ample support in our jurisprudence for the proposition that reputational stigma can, by itself, constitute a deprivation of liberty deserving due process.

■ Accordingly, we hold that competency determinations sufficiently implicate reputational interests to warrant the protection afforded by the State Due Process Clause. *See Harris v. Nashville Trust Co.*, 162 S.W. 584, 585 (Tenn. 1914) ("The enjoyment of private reputation *unassailed* is a right entitled to the protection of the law and of the Constitution as much as are the rights to the possession of life, liberty, or property."); *cf. R. v. Com., Dept. of Public Welfare*, 636 A.2d 142, 149 (Pa. 1994) (recognizing that Pennsylvania's State Constitution expressly recognizes reputation as a fundamental interest enjoying due process protection). Guaranteeing some minimal process guards against the difficulty of undoing harm once visited upon a person's good name. *Cf. Goldberg v. Kelly*, 397 U.S. 254, 263-64 (1970). In instances such as the present one, a person may not immediately suffer the more tangible effects of such a determination. We have long recognized that some forms of reputational harm can safely be assumed. *See, e.g., Lassonde v. Stanton*, 157 N.H. 582, 593 (2008) (discussing recovery of damages for harm to reputation without proof of special damages under doctrine of libel *per se*).

■ Having concluded that competency determinations can potentially damage the protected interest in reputation, we consider what process is required to protect that interest. *See McLellan*, 146 N.H. at 114. In so doing, we balance three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*State v. Lavoie*, 155 N.H. 477, 482 (2007) (quotation omitted). We begin by outlining the process governing competency determinations.

■ "The mental competence of a criminal defendant at the time of trial is an absolute basic condition of a fair trial." *State v. Haycock*, 146 N.H. 5, 6 (2001) (quotation omitted). "[C]ompetency is measured by his abilities at the time of the trial proceeding." *Zorzy*, 136 N.H. at 715. "A defendant is competent if he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding, and if he has a rational as

well as a factual understanding of the proceedings against him." *Haycock*, 146 N.H. at 6 (quotations and brackets omitted). "The State bears the burden of proving both . . . elements [of competency] by a preponderance of the evidence." *Id.*

■ Raising the issue of competency is an ethical obligation incumbent upon defense counsel in certain circumstances. The American Bar Association (ABA) Standards, which we have looked to when developing similar procedures, *see State v. Cigic*, 138 N.H. 313, 317 (1994), provide, in relevant part:

> Defense counsel should move for evaluation of the defendant's competence to stand trial whenever the defense counsel has a good faith doubt as to the defendant's competence. If the client objects to such a motion being made, counsel may move for evaluation over the client's objection. In any event, counsel should make known to the court and to the prosecutor those facts known to counsel which raise the good faith doubt of competence.

ABA CRIMINAL JUSTICE STANDARDS COMMITTEE, ABA CRIMINAL JUSTICE MENTAL HEALTH STANDARDS Standard 7-4.2(c), at 176 (1989).

■ In addition, we require that the trial court *sua sponte* inquire into competency whenever a bona fide or legitimate doubt arises whether a criminal defendant is competent to stand trial. *State v. Bertrand*, 123 N.H. 719, 725 (1983). "In determining whether to order a competency hearing, the trial court should consider evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competency." *Zorzy*, 136 N.H. at 715 (quotations omitted).

After the competency issue has been raised, the trial court "may make such order for a pre-trial psychiatric examination of such person" to be "completed within 60 days after the date of the order." RSA 135:17, I (2005). RSA 135:17, II (2005) permits separate competency evaluations upon request of the parties. RSA 135:17, II(a)-(b) speak to the purpose and substance of such evaluations. RSA 135:17, III (2005) requires specific findings as to the ability to restore competency if found incompetent. The defendant may appeal as of right and obtain a review of the merits. *See* SUP. CT. R. 3 (defining "Mandatory appeal" and "Decision on the merits").

Against this backdrop, we balance the three factors to determine whether the defendant received due process under the State Constitution.

## I. Private Interests

■ As discussed above, two substantial interests are particularly relevant in the competency determination: the stigma attached to a finding of legal incompetency and the constitutional right not to be tried if incompetent.

An official branding of legal incompetence unquestionably entails some degree of social stigma. *Cf. In re Richard A.*, 146 N.H. 295, 298 (2001) (recognizing "loss of liberty and social stigmatization" caused by civil commitment proceedings and describing them as "substantial"). This stigma may harm the defendant's own self-conception, *see generally* Mitnick, *supra*, and adversely affect a variety of liberty and property interests. Specifically, the defendant points to his "ability to conduct and control civil litigation," the potential estoppel effect of the incompetency finding in other proceedings, "all manner of professional licensing," employment decisions, "willingness of others to engage in commercial transactions," the ability to travel internationally, and finally the "right to purchase, possess, and sell firearms in some jurisdictions."

■ Competency determinations also concern the right not to be tried if incompetent, a right that is probably not subject to waiver. *See Pate v. Robinson*, 383 U.S. 375, 384 (1966) ("[I]t is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently 'waive' his right to have the court determine his capacity to stand trial."); ABA CRIMINAL JUSTICE STANDARDS COMMITTEE, *supra* at 180.

> It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial. . . . Some have viewed the common-law prohibition as a by-product of the ban against trials *in absentia*; the mentally incompetent defendant, though physically present in the courtroom, is in reality afforded no opportunity to defend himself. . . . For our purposes, it suffices to note that the prohibition is fundamental to an adversary system of justice.

*Drope v. Missouri*, 420 U.S. 162, 171-72 (1975) (quotation omitted).

■ The two interests at stake are not in tension; that is, one procedure for reliably determining the competency issue equally protects both. *See Harrison v. Wille*, 132 F.3d 679, 683 n.9 (11th Cir. 1998) (holding that procedural opportunity to clear reputation was provided by virtue of

process preceding employment termination); *cf. Petition of Preisendorfer*, 143 N.H. at 53; In re *Tracy M.*, 137 N.H. at 124.

## II. Risk of Erroneous Deprivation/Probable Value of Additional Process

The defendant argues that his attorneys pursued an incompetency finding while the State took virtually no position, resulting in a constitutionally deficient lack of adversarial testing. The process he seeks is the appointment of additional counsel and/or guardians to ensure the competency issue is fully litigated in an adversarial proceeding.

■ "[T]he requirements of due process are flexible and call for such procedural protections as the particular situation demands." *Wilkinson*, 545 U.S. at 224 (quotation and brackets omitted). Here, the defendant's legal competency to be tried for the alleged crimes was the issue being adjudicated. Although competency is ultimately governed by a legal standard, the determination is largely based upon medical observation and testimony. *See* RSA 135:17; *State v. Briand*, 130 N.H. 650, 653 (1988) (recognizing that court has inherent authority to order a defendant to submit to psychiatric evaluation).

■ Full adversarial testing is not always the most desirable method of evaluating such testimony. In *Mathews v. Eldridge*, 424 U.S. 319, 344 (1976), the Court determined that disability benefit determinations did not require full adversarial testing because they usually turned "upon routine, standard, and unbiased medical reports by physician specialists, concerning a subject whom they have personally examined." *Mathews*, 424 U.S. at 344 (quotation and citation omitted). It noted previous holdings recognizing the "reliability and probative worth of written medical reports," and the reduced importance of evaluating witness credibility and veracity. *Id.* (quotation omitted).

In *Secretary of Public Welfare v. Institutionalized Juveniles*, 442 U.S. 640, 649-50 (1979), the Court upheld voluntary admission procedures for mentally ill children in the absence of an adjudicative hearing primarily because "[n]o child is admitted without at least one and often more psychiatric examinations by an independent team of mental health professionals whose sole concern . . . is whether the child needs and can benefit from institutional care."

■ After the public defenders raised the issue, the procedural determination of the defendant's competency consisted of the following: two medical experts personally examined him and determined whether, in their opinion, he met the legal standard for competency; an impartial judicial fact finder evaluated the expert medical testimony with the assistance of

counsel and issued detailed written findings and rulings; notice was given to all parties of the proceeding, and a hearing was held on the record before any finding of incompetency was entered. Pursuant to RSA 135:17, III, any expert conclusion of incompetency was required to "include the examiner's findings as to whether there is a course of treatment which is reasonably likely to restore the defendant to competency." And, the trial court's competency decision was subject to appellate review with appointed counsel. *See Wilkinson*, 545 U.S. at 226 (subsequent review of a determination and "a short statement of reasons" provided by the "decisionmaker" also help "guard[] against arbitrary decisionmaking"). We hold that these procedures, taken together, sufficiently protect the defendant's reputational interest by ensuring a reliable competency determination.

Likewise, we find the value of additional process in deciding the competency issue minimal. The defendant contends that if he had not been "functionally precluded" from testifying and offering evidence, then "the outcome of the competency hearing might very well have been different."

"[A] fair opportunity for rebuttal" is "among the most important procedural mechanisms for purposes of avoiding erroneous deprivations." *Wilkinson*, 545 U.S. at 226. Thus, had the defendant requested to testify or call other witnesses at the competency hearing, due process may well have afforded him that right. *See People v. Harris*, 18 Cal. Rptr. 2d 92, 98 (Ct. App. 1993); *cf.* 18 U.S.C. §§ 4241(c), 4247(d) (2000) (stating that federal defendant should be afforded opportunity to testify and call witnesses at competency hearing). On the record before us, however, it appears that the defendant never requested as much. While the defendant moved *pro se* for certain relief prior to the competency hearing, his motion effectively only requested new counsel. Had the defendant wished to testify, he should have informed his counsel and/or the trial court instead of raising the issue for the first time in his 2006 *pro se* notice of appeal. Accordingly, we cannot say that he was denied any such right.

In addition, we note that the defendant was personally interviewed by both medical experts. These interviews provided him with a forum to demonstrate competency, *see Parham v. J.R.*, 442 U.S. 584, 606-07 (1979); *Codd v. Velger*, 429 U.S. 624, 627 (1977) (holding that only process due a stigmatizing injury is an opportunity to refute the charge), and the medical experts later testified at the competency hearing, *cf. Richardson v. Perales*, 402 U.S. 389, 402 (1971) (written report by a physician who examined claimant and who set forth in his report his medical findings is admissible in disability hearing and, despite its hearsay character and absence of cross-examination, may constitute substantial evidence supportive of an adverse finding).

We find little value in the defendant's proposed procedure whereby his appointed counsel would, over his client's objection, simply "flag[]" the competency issue and then contest that issue, with a guardian ad litem appointed to protect the defendant in case he was in fact incompetent.

If the competency issue is serious enough to flag, defense counsel will have a good faith doubt as to the defendant's competency. *See* ABA CRIMINAL JUSTICE STANDARDS COMMITTEE, *supra* at 176. In such a case, it is the right not to be tried if incompetent that should first be protected by counsel. *See id.* at 181 (recognizing that Standard 7-4.2(c) "resolves the difficult conflict of concerns inherent in such circumstances . . . in favor of counsel's obligation to the court"). Furthermore, nowhere is the defendant's desired procedure contemplated within the comprehensive comments to ABA Standard 7-4.2. *See id.* at 177.

We also note that appointing a guardian ad litem is tantamount to appointing separate counsel because, assuming the State's neutrality, the task of asserting and demonstrating incompetency in the adversarial procedure would fall to the guardian. On these facts, and in consideration of the authorities discussed below, we decline to recognize a right to separate appointed counsel under the Due Process Clause.

██ We have clearly said that where "the primary focus of a[] . . . proceeding is the mental condition and dangerousness of the person . . . rather than determination of guilt or innocence, the full range of protections afforded by the State . . . due process provision[] does not come into play." *In re Richard A.*, 146 N.H. at 298 (quotation and brackets omitted).

██ The defendant received the assistance of counsel guaranteed by Part I, Article 15 of the State Constitution in raising the competency issue and evaluating the expert testimony — both tasks undertaken in vindicating his right not to be tried if incompetent. We have cast doubt upon the notion that the Due Process Clause expands upon the constitutional right to appointed criminal counsel. *See State v. Westover*, 140 N.H. 375, 378 (1995); *cf. State v. Gibbons*, 135 N.H. 320, 323 (1992). Although we have recognized that a *due process* right to counsel might attach in "complicated nonsupport contempt hearing[s]," *Duval v. Duval*, 114 N.H. 422, 427 (1974), we do not find *Duval* controlling here. *Duval* rested primarily upon the potential for incarceration after the proceedings, *Duval*, 114 N.H. at 424, 426 (discussing *Gagnon v. Scarpelli*, 411 U.S. 778 (1973)), whereas here any loss of liberty flowing from infringement upon the *reputational* interest does not rise to a similar level. Thus, declining to appoint counsel solely to vindicate that interest does not offend "fundamental fairness." *Saviano*, 151 N.H. at 320; *see United States v. Boigegrain*, 155 F.3d 1181, 1188 (10th Cir. 1998) (rejecting argument that additional or substitute counsel was necessary to

satisfy due process where defense counsel moved for a competency evaluation over the client's wishes), *cert. denied*, 525 U.S. 1083 (1999); *State v. Cunningham*, 105 P.3d 929, 943 (Or. Ct. App.) ("Where a criminal defendant is at odds with counsel because counsel believes that the defendant is not competent, while the defendant believes that he or she is competent . . . [, d]ue process does not require the appointment of additional counsel . . . ."), *review denied*, 122 P.3d 64 (Or. 2005).

We therefore conclude that the procedures attending the competency adjudication reliably guard the defendant's reputational interest and the value of additional process is minimal.

### III. Government's Interest

The State does not address the cost of any additional procedures. The defendant argues that his desired procedure would be an "insignificant" burden upon the government. While we agree with the defendant that his desired process does not appear to require "the expenditure of substantial State resources," *In re Richard A.*, 146 N.H. at 300, we note that it requires significantly more than he asserts. Although competency hearings are somewhat infrequent, fully litigating the competency issue in an adversarial proceeding with two sets of appointed counsel entails decidedly more discovery, motion practice and judicial resources than the model used to determine the defendant's competency. Accordingly, if anything, this factor counsels against the additional process the defendant seeks.

### IV. Conclusion

After balancing the private interest here at issue; the risk of an erroneous deprivation of that interest through the procedures used, and the probable value of additional procedural safeguards; and the Government's interest, we conclude that due process does not require additional process under the State Constitution.

Because we hold that the State Constitution is more protective in this context than its federal counterpart, we reach the same result under the Federal Constitution.

*Affirmed.*

BRODERICK, C.J., and DALIANIS and DUGGAN, JJ., concurred.