NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by email at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: https://www.courts.nh.gov/our-courts/supreme-court

THE SUPREME COURT OF NEW HAMPSHIRE

———————————————

3rd Circuit Court-Ossipee Family Division
Case Nos. 2023-0151
          2023-0639
Citation: Petition of K.S., 2024 N.H. 62


PETITION OF K.S.

Argued: September 10, 2024
Opinion Issued: November 8, 2024

Children's Law Center of New Hampshire, of Portsmouth (Stephanie Hausman and Lisa L. Wolford on the brief, and Stephanie Hausman orally), for the petitioner.

John M. Formella, attorney general, and Anthony J. Galdieri, solicitor general (Laura E. B. Lombardi, senior assistant attorney general, on the brief, and Mary A. Triick, senior assistant attorney general, orally), for the New Hampshire Division for Children, Youth and Families.

DONOVAN, J.

[¶1] The petitioner, K.S., seeks certiorari review of orders issued by the Circuit Court (Countway, J.) in proceedings pursuant to RSA chapter 169-C (2022 & Supp. 2023). K.S. argues that the trial court erred by: (1) denying her access to information to which she had statutory and due process rights; (2)

relying on a "reasonable efforts" standard rather than the child's best interest analysis to address placement and services recommendations; (3) declining to hold an evidentiary hearing prior to approving her placement in a residential treatment program in violation of her right to due process; (4) denying her request to be placed with her father; (5) denying her request to "change the dispositional order to reflect changes in the case, her needs, and the circumstances"; and (6) denying her request to "allow her grandmother to be involved in family therapy, permanency planning, and other team meetings." We affirm.

## I. Facts

[¶2] The following facts are drawn from the record. In April 2022, the respondent, the New Hampshire Division for Children, Youth and Families (DCYF), filed petitions alleging neglect by both K.S.'s mother and father. Following a preliminary hearing, the court issued an order finding reasonable cause to believe that both parents neglected K.S., and it awarded DCYF protective supervision to place K.S. in an out-of-home placement. Both parents subsequently consented to the neglect findings. Over the following months, K.S. resided with an aunt, her father, a friend, and others until each placement requested that she be removed by DCYF. In July 2022, the court granted DCYF legal custody of K.S. The same month, the court issued a dispositional order finding that returning K.S. to either of her parents' care was contrary to K.S.'s welfare because neither parent was willing or able to care for K.S.

[¶3] In November 2022, a child protective services worker informed K.S.'s father of the circumstances leading to K.S.'s removal from her most recent placement. After the father expressed concerns for K.S.'s safety, he filed a request for involuntary emergency admission of K.S. to a hospital. Although K.S. did not meet the criteria for involuntary emergency admission, her father nonetheless asked that she be voluntarily held at the hospital. K.S. remained at the hospital for approximately one week before being transferred to another hospital, where she stayed until January 2023. During this time, K.S. filed a motion seeking: (1) an emergency hearing regarding her hospitalization; (2) discovery relating to, among other things, DCYF's efforts to provide mental health services and identify appropriate foster placements; and (3) an order authorizing her to obtain medical records from both hospitals.

[¶4] The court held an emergency hearing on December 1, 2022, and six-month review and motion hearings on January 3, 2023. On January 4, the court issued an order approving K.S.'s placement in the CAST program, which DCYF defined as a sixty-day diagnostic program that recommends future treatment placements. In so doing, the court denied K.S.'s request to be reunified with her father. The court also found that DCYF made reasonable efforts toward reunification and concluded that DCYF provided services to the

family "that are accessible, available and appropriate."  Regarding K.S.'s discovery requests, the court ruled that: (1) K.S. should access her medical records "through the use of a release" to be obtained from her father; (2) DCYF case notes and other forms are discoverable; and (3) "many of the [remaining] items sought in [K.S.'s motion] are overly broad, unduly burdensome and/or simply not discoverable in the context of this juncture of the proceeding."  K.S. moved for reconsideration, which the court denied.[1]

[¶5] At a March 2023 hearing regarding K.S.'s post-CAST program placement, DCYF recommended that K.S. be placed at a residential treatment program in Vermont based upon the level of care K.S. required pursuant to a Comprehensive Assessment for Treatment (CAT).  DCYF explained that it considered placements outside of New Hampshire in order to locate a program that could accommodate K.S.'s needs.  K.S. challenged the validity of the CAT and her placement, requesting that she instead be placed in a family setting in her home community.  The court subsequently issued an order accepting the CAT's recommended level of care and granting DCYF's request to place K.S. at the residential treatment program in Vermont.

[¶6] Before the nine-month review hearing, K.S. requested that she be placed with her father.  However, following the hearing, the court granted DCYF's recommendation that K.S.'s treatment continue at the residential program.  In its order, the court also recommended family therapy on the terms and conditions identified by the treatment facility.

[¶7] Prior to the twelve-month permanency hearing, K.S. filed a motion to compel DCYF to produce extensive discovery relating to DCYF's placement decisions.  DCYF objected, claiming that the "vast majority" of K.S.'s requests had already been fulfilled and that the remaining requests were "burdensome, overbroad, and not reasonably tailored to obtaining information necessary for the Court's determination of the issues presented."  DCYF also expressed its "concern over the conduct of this litigation, as well as the impact it has on the child."  The court denied K.S.'s motion for the reasons articulated by DCYF.

[¶8] The court held a twelve-month permanency hearing in June 2023.  K.S.'s father had previously stated that he wished to surrender his parental rights.  At the hearing, K.S. communicated her desire to live with her maternal grandmother, begin the next school year at her local high school, have the court approve her father's surrender of his parental rights, close the RSA chapter 169-C case, and maintain a "legal relationship with her mother and siblings."  DCYF recommended guardianship, and Court Appointed Special

---

[1] On March 8, 2023, K.S. filed a petition for a writ of certiorari in this court seeking review of the trial court's January 2023 order.  See Sup. Ct. R. 11.  In April 2023, K.S. filed a motion to stay the proceedings in this court pending the trial court's resolution of issues raised at the twelve-month permanency hearing, and we granted the motion.

Advocates of New Hampshire (CASA) recommended adoption. The court accepted CASA's recommendation and found adoption to be the best plan to achieve permanency for K.S. The court explained that it considered K.S.'s input, "which supports adoption by her grandmother."

[¶9] Thereafter, DCYF filed, and the court approved, petitions for the termination of the parents' parental rights "to ensure [K.S.] could be freed for adoption." DCYF placed K.S. with her maternal grandmother in August 2023. In November 2023, K.S. filed a second petition for a writ of certiorari in this court. See Sup. Ct. R. 11.

[¶10] The following month, K.S.'s grandmother notified DCYF that she was no longer able to care for K.S. DCYF placed K.S. at another residential treatment program in February 2024, deeming the placement appropriate based on her needs. The court awarded DCYF guardianship over K.S. pursuant to RSA 170-C:11, II (2022). Following an April 2024 post-permanency hearing, the court changed K.S.'s permanency plan to "another planned permanent living arrangement," finding the change appropriate "given [K.S.'s] age (including the ability to object to any adoption), the need for independent living skills, and lack of available pre-adoptive placements."

## II. Analysis

[¶11] Review on certiorari is an extraordinary remedy, usually available only in the absence of a right to appeal, and only at the discretion of the court. Petition of N.H. Div. for Children, Youth and Families, 170 N.H. 633, 639 (2018). We exercise our power to grant such writs sparingly and only when to do otherwise would result in substantial injustice. Id. "Our review of a court decision on a petition for a writ of certiorari entails examining whether the court acted illegally with respect to jurisdiction, authority or observance of the law, or unsustainably exercised its discretion or acted arbitrarily, unreasonably, or capriciously." In re J.H., 171 N.H. 40, 47 (2018) (quotation omitted).

[¶12] We first address K.S.'s argument that the trial court erred in denying her access to information "to which she was statutorily entitled and which was relevant to her best interest with regard to treatment and placement" prior to its January and March 2023 placement decisions and its June 2023 permanency order. First, K.S. maintains that from November 2022 to January 2023, she was hospitalized longer than medically necessary due to DCYF's failure to identify an appropriate placement. K.S. alleges that, during this time, she was denied access to information regarding her hospitalization, DCYF's placement efforts, and her father's other child custody case that was relevant to the court's January 2023 placement determination. Second, K.S. alleges that the court erred in failing to order DCYF to provide her with information regarding its efforts to secure a foster family placement prior to the

4

court's March 2023 order approving her placement at the residential treatment program in Vermont. Third, K.S. claims that, prior to issuing its June 2023 permanency order, the court "failed to ensure that [she] had all relevant information about the permanency options." K.S. asserts both statutory and due process rights to the information sought. DCYF maintains that K.S. "fails to demonstrate error or actual prejudice with respect to any of these categories."

[¶13] In view of the more recent developments in K.S.'s case, we first consider whether these issues, which pertain to the court's January, March, and June 2023 orders, are moot. Generally, a matter is moot when it no longer presents a justiciable controversy because the issues involved in the case have become academic or dead. Londonderry Sch. Dist. v. State, 157 N.H. 734, 736 (2008). An issue that has already been resolved is not entitled to judicial intervention. Appeal of Hinsdale Fed. of Teachers, 133 N.H. 272, 276 (1990). However, "[m]ootness is not subject to rigid rules, but is a matter of convenience and discretion." State v. Luwal, 175 N.H. 467, 470 (2022). A case may not be moot if it presents legal issues that are of pressing public interest and that are capable of repetition yet evading review. Id.

[¶14] We conclude that issues pertaining to the court's January and March 2023 placement decisions, which resulted in K.S.'s placement in the sixty-day CAST program and then the residential treatment program in Vermont, are moot because K.S. is no longer at those placements. K.S. was placed in the CAST program in January 2023 and at the residential treatment program in Vermont beginning in March 2023. After leaving the program in Vermont, K.S. was placed with her grandmother in August 2023 and at another residential treatment program in February 2024. Therefore, regardless of whether the trial court unsustainably exercised its discretion in the management of discovery in this case, issues pertaining to K.S.'s January and March 2023 placements no longer present a justiciable controversy. See In the Matter of O'Neil & O'Neil, 159 N.H. 615, 624 (2010).

[¶15] Similarly, the issue of whether the trial court erred in failing to order DCYF to provide K.S. with information prior to the June 2023 permanency order is also moot. In its permanency order, the court, consistent with K.S.'s expressed desire to be placed with her grandmother, found adoption by K.S.'s grandmother to be the best plan to achieve permanency. The parental rights of K.S.'s parents were terminated, and K.S. was placed with her grandmother. However, K.S.'s grandmother subsequently notified DCYF that she could no longer care for K.S. DCYF thereafter placed K.S. at a residential treatment program and changed K.S.'s permanency plan from "adoption through termination of parental rights or surrender" to "another planned permanent living arrangement (APPLA)." Therefore, because the June 2023 permanency order is no longer in effect, the issue of whether the court erred in denying K.S.'s discovery requests is moot. See id.

5

[¶16] We next consider K.S.'s argument that the court erred by "excusing [DCYF's] failures" to "secure community-based counseling services," "obtain other trauma-mitigating services and supports," and "demonstrate any effort toward securing alternative family-based placements for her" under the "low bar of the reasonable-efforts standard." K.S. challenges the court's January 2023 order approving her placement in the CAST program following the six-month review hearing. Specifically, K.S. takes issue with the court's conclusion that, "[k]eeping in mind that the applicable standard is whether the State has made reasonable efforts to finalize the permanency plan . . . the State has made reasonable efforts towards reunification." (Emphasis omitted.) K.S. alleges that the court's reference to "reasonable efforts" was error and that DCYF's efforts must be measured according to the "best interests" standard. However, because K.S. is no longer in the CAST program, the issue of whether the court properly assessed DCYF's services and placement efforts prior to its January 2023 placement decision is moot. See id.

[¶17] K.S. next argues that the court "decided issues related to [her] hospitalization and her institutional placement without affording her an evidentiary hearing of sufficient length to call witnesses" in violation of her right to due process of law. On December 23, 2022, K.S. requested that the court hold a two-hour evidentiary hearing in addition to the six-month review and motion hearings scheduled for January 3, 2023. The court denied the request, explaining that it was unable to accommodate a two-hour hearing on January 3. K.S. alleges that the court erred by denying her request for an evidentiary hearing and "restricting the information upon which it relied" in approving her placement in a residential program. DCYF responds that a hearing is not required prior to a residential placement.

[¶18] As we have explained, issues relating to the court's January 2023 order approving DCYF's recommendation that K.S. be placed in the CAST program are moot. See id. However, we agree with K.S. that the issue of whether a child in DCYF's custody is entitled to an evidentiary hearing prior to being placed in an institutional out-of-home placement presents an issue of pressing public interest that is capable of repetition yet evading review. See Appeal of Hinsdale Fed. of Teachers, 133 N.H. at 276. We therefore will address the merits of her argument. Cf. Petition of Brooks, 140 N.H. 813, 816 (1996) (addressing petitioner's claim "because it raises a significant constitutional issue").

[¶19] K.S. claims that the court's failure to hold an evidentiary hearing violated her procedural due process rights under the State and Federal Constitutions. The threshold issue in a procedural due process claim is whether there is a constitutionally protected interest at stake. In the Matter of Akin & Suljevic, 174 N.H. 743, 753 (2022). If such an interest is at stake, we then determine whether the procedure at issue afforded the requisite safeguards, mindful that the requirements of due process are flexible and call

6

for such procedural protections as the particular situation demands. Id.; see Mathews v. Eldridge, 424 U.S. 319, 334 (1976). Procedural due process requires that parties whose rights are affected "have the opportunity to be heard at a meaningful time and in a meaningful manner." Mathews, 424 U.S. at 333. "The ultimate standard for judging a due process claim is the notion of fundamental fairness." State v. Veale, 158 N.H. 632, 637 (2009) (quotation omitted).

[¶20] Part I, Article 15 of the New Hampshire Constitution provides in part: "No subject shall be . . . deprived of his property, immunities, or privileges, put out of the protection of the law, exiled or deprived of his life, liberty, or estate, but by the judgment of his peers, or the law of the land." N.H. CONST. pt. I, art. 15. The phrase "law of the land" means due process of law. In re C.M., 163 N.H. 768, 771 (2012). We first address K.S.'s arguments under the State Constitution and rely upon federal law only to aid our analysis. See State v. Ball, 124 N.H. 226, 231-33 (1983).

[¶21] We have not previously discussed whether a child in DCYF's custody has a due process right to an evidentiary hearing prior to placement in an institutional setting. Here, the parties do not dispute that K.S. possesses a constitutional liberty interest during neglect proceedings. We will assume, without deciding, that K.S. has a protected liberty interest in her placement in an out-of-home institutional setting. Cf. In the Matter of Stapleford & Stapleford, 156 N.H. 260, 264 (2007) (assuming without deciding that children have a protected liberty interest in the outcome of their parents' divorce). Therefore, we next consider whether the procedure at issue afforded the requisite safeguards. See In the Matter of Akin & Suljevic, 174 N.H. at 753.

[¶22] To determine whether the State Constitution requires an evidentiary hearing prior to an out-of-home placement, we employ the three-prong test articulated by the United States Supreme Court in Mathews v. Eldridge, 424 U.S. at 335. See In re C.M., 163 N.H. at 772. This test balances: (1) the private interest affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail. Id.; Mathews, 424 U.S. at 335.

[¶23] Regarding the private interest affected, K.S. contends that her "interest in an accurate and well-founded decision on institutional placement was substantial" and that the government "shares her interest in accurate fact-finding related to the need for institutional placement." We agree that both the child and DCYF share an interest in locating an appropriate placement. See RSA 169-C:2, II(d) (2022) ("This chapter seeks to coordinate efforts by parents and state and local authorities, in cooperation with private agencies and

7

organizations, citizens' groups, and concerned individuals" to, inter alia, "[p]rovide protection, treatment, and rehabilitation, as needed, to children placed in alternative care."). However, as DCYF notes, in light of its legal custody of K.S., K.S.'s private interests at the placement hearing were "significantly less" than at the dispositional hearing. Indeed, as K.S.'s legal custodian, DCYF had authority over her placement. See RSA 169-C:3, XVII(a)-(b) (2022) (defining legal custody as including, inter alia, the right to "determine where and with whom the child shall live" and "have the physical possession of the child").

[¶24] K.S. claims that the risk of erroneous deprivation through the procedures used was "palpable" because the court relied upon inaccurate representations made by DCYF. DCYF disagrees, arguing that, given the procedure established by RSA 169-C:19-f authorizing courts to review independent assessments when a child is placed in a residential facility, an evidentiary hearing would "provide little value, especially where the CAT assessment process includes a procedure through which parties may seek reconsideration, as [K.S.] did in this case." We agree with DCYF.

[¶25] The child's best interest is well protected by RSA chapter 169-C's established procedures. See RSA 169-C:2 (2022). One of RSA chapter 169-C's stated purposes is "to establish a judicial framework to protect the rights of all parties involved in the adjudication of child abuse or neglect cases" and to "provide effective judicial procedures . . . which recognize and enforce the constitutional and other rights of the parties and assures them a fair hearing." RSA 169-C:2, II-III. RSA 169-C:24 (2022) sets forth procedures for periodic review hearings, and RSA 169-C:19-f (2022) provides that, when a child is placed in a "qualified residential treatment program," the court shall order an assessment, and based upon its review of that assessment, issue an order "approving the placement or changing the placement within 60 days." Moreover, the CAT assessment is subject to reconsideration in certain circumstances and K.S. availed herself of such procedure to obtain reconsideration of the February 2023 CAT determination following the court's March 2023 placement decision. These procedures allow parties to seek review and challenge the accuracy of the findings upon which the court's decisions are based, and they protect the child's interest in well-founded decisions. We are not persuaded that holding an evidentiary hearing would provide additional value in this context.

[¶26] Finally, as to the government's interest, K.S. argues that the burden of an evidentiary hearing is "minimal." DCYF responds that "requiring the court to hold an evidentiary hearing before approving a child's placement for residential treatment would impede DCYF's ability to provide" for the child and would create a significant burden for the courts. We agree with DCYF. As mentioned above, RSA 169-C:19-f requires the court to review and either approve or change a child's placement in a qualified residential treatment

8

program.  If the court were required to hold an evidentiary hearing prior to approving a child's placement in a qualified residential treatment program, the court's placement decisions would be delayed, as would the child's access to the services provided by the pending placement.  Here, the court was unable to hold a two-hour evidentiary hearing in addition to the six-month review and motion hearings on January 3.  K.S. maintains that her hospitalization beginning in November 2022 was longer than medically necessary and that DCYF "failed to identify a legitimate placement for her."  However, had the court granted her request and scheduled an evidentiary hearing for a later date, approval of K.S.'s placement in the CAST program, which ended her hospitalization, may have been further delayed.  K.S.'s argument thus underscores the importance of a timely ruling on DCYF's placement recommendation.

[¶27] Accordingly, weighing the above factors, we hold that the court's approval of K.S.'s placement in an institutional setting without holding an evidentiary hearing did not violate K.S.'s right to due process.  We note that our conclusion is consistent with that of the Vermont Supreme Court, which rejected a similar argument and ruled that a change in a child's placement without "a prior due process hearing" did not violate the child's right to due process.  See In re J.S., 571 A.2d 658, 663-64 (Vt. 1989).  Because the State Constitution is at least as protective of individual liberties in these circumstances as the Federal Constitution, see In re Samantha L., 145 N.H. 408, 414 (2000); Mathews, 424 U.S. at 334-35, we reach the same result under the Federal Constitution.

[¶28] We next consider K.S.'s argument that the court erred by denying her request to be placed with her father at the six-month review hearing.  This issue is moot.  See In the Matter of O'Neil & O'Neil, 159 N.H. at 624.  K.S.'s father surrendered his parental rights in September 2023.  The termination of his parental rights "divest[ed] the parent and the child of all legal rights, privileges, duties and obligations."  RSA 170-C:12 (2022).  Therefore, even were we to find error in the court's denial of K.S.'s request to be placed with her father, the relief she presumably seeks — to be placed in his care — is no longer possible.  Similarly, issues relating to the court's refusal to update the July 2022 dispositional order to require K.S.'s father's participation in family therapy while K.S. was placed in Vermont are moot.  See In the Matter of O'Neil & O'Neil, 159 N.H. at 624.

[¶29] Finally, K.S. argues that the court erred by denying her request to allow her grandmother to be involved in family therapy, permanency planning, and other team meetings.  Following the permanency hearing, K.S. requested the court's permission to share case information with her grandmother and to permit her grandmother to attend transition and treatment meetings.  CASA objected on the grounds that the grandmother was not a party to the case and DCYF had not yet completed the home study required to place K.S. in her

9

grandmother's care. CASA also noted that the grandmother could request access to the case information pursuant to RSA 169-C:25, I(b). The court agreed with CASA and denied K.S.'s request.

[¶30] Regarding K.S.'s request to share case information with her grandmother, RSA 169-C:25, I(b) (2022) instructs that "[a] grandparent seeking access to court records . . . shall file a request for access with the court clerk supported by an affidavit signed by the grandparent stating the reasons for requesting access." The record does not indicate that the grandmother made such a request. In addition, although RSA 170-G:8-a, II (2022) grants DCYF discretion to disclose Department of Health and Human Services case records to "[a]nother member of the family of the child named in the case record, if disclosure is necessary for the provision of services to the child or other family member," it does not require DCYF to do so. See RSA 170-G:8-a, II(a)(4). Noting "the history of acrimony" between K.S.'s father and grandmother, CASA objected to sharing all case information until DCYF determined whether adoption by K.S.'s grandmother would be appropriate. We are not persuaded that the court erred by declining to order DCYF to disclose its records to K.S.'s grandmother.

[¶31] Regarding K.S.'s requests that her grandmother be allowed to attend transition meetings and court hearings, the record reflects that the grandmother attended weekly transition meetings when K.S. was in Vermont. In any event, in December 2023, K.S.'s grandmother notified DCYF that she was no longer able to care for K.S. and asked that DCYF find a new placement. Although K.S. may continue to seek her grandmother's involvement in her case, the court changed K.S.'s permanency plan in April 2024 to APPLA because adoption by her grandmother was no longer a viable option. On the record before us, we cannot conclude that the trial court erred by denying K.S.'s motion.

[¶32] The additional arguments that K.S. raises do not warrant further discussion. See Vogel v. Vogel, 137 N.H. 321, 322 (1993). We conclude that the court did not act illegally with respect to jurisdiction, authority or observance of the law, and it neither unsustainably exercised its discretion nor acted in an arbitrary, unreasonable, or capricious manner. See In re J.H., 171 N.H. at 47.

Affirmed.

MACDONALD, C.J., and BASSETT, J., concurred.

10