Rochester Family Division
No. 2010-609

IN RE GUARDIANSHIP OF NICHOLAS P.

Argued: May 5, 2011
Opinion Issued: June 28, 2011

*Krans Law Firm*, of Dover (*Hamilton R. Krans, Jr.* on the brief and orally), for the petitioner.

*Kay Oppenheimer*, of Barrington, on the brief and orally, for the respondent.

*Michael Alfano*, guardian ad litem, of Portsmouth, by memorandum and orally.

CONBOY, J. The respondent, Rebecca P., appeals an order of the Rochester Family Division (*Ashley*, J.) awarding guardianship of her son, Nicholas P., to Jonathan P., her son's half-brother. We affirm.

The trial court found the following facts. Nicholas is the son of Rebecca P. and Martin P. Jonathan P. is Martin's son from a previous relationship. In May 2007, Martin and Rebecca lived in Dover with then nine-year-old Nicholas, fifteen-year-old Jonathan, and Rebecca's teenage daughter from a previous relationship, Danielle. The couple were having marital difficulties, and on May 14, 2007, Rebecca left with Danielle for South Carolina without advance notice to the rest of the family. Rebecca left behind a note addressed to Martin, Jonathan, and Nicholas in which she promised to return in a month, but she never relocated back to New Hampshire.

Martin and Nicholas briefly visited Rebecca in South Carolina in the summer of 2008, and Nicholas spent six weeks with her there the following summer. Otherwise, mother and son saw each other only briefly over the next two years. Nicholas was upset and angry, and felt abandoned. In August 2009, Martin initiated divorce proceedings against Rebecca.

Martin died suddenly on October 13, 2009. Soon thereafter, Rebecca sought *ex parte* approval in the divorce case to take Nicholas with her to South Carolina. Her request was denied. Jonathan then petitioned for guardianship of Nicholas. A hearing on Jonathan's guardianship petition was held on June 25, 2010. A guardian ad litem (GAL) represented Nicholas's interests.

At the time of the hearing, Jonathan was eighteen years old. His high school record evidenced a history of "skipping classes, defiance, and disrespect." He testified that Rebecca had introduced him to drug and alcohol use at age fourteen, and that he had experimented with both. However, the trial court found that "almost overnight following the death of the boys' father, [Jonathan] transformed himself into a man and a parent figure for Nicholas. By all accounts, including that of Rebecca P[.],

Jonathan . . . 'stepped up to the plate.' " Jonathan had not used drugs or alcohol since Martin's death. He was working thirty-one hours a week at a Wendy's restaurant, keeping weekends and one weekday available to take Nicholas to counseling and medical appointments. At home, he was cooking, cleaning, supervising Nicholas's studying, and enforcing reasonable rules. He and Nicholas were interacting in a "gray area between parent and older sibling." In sum, the trial court found that "Jonathan's devotion to his brother . . . has allowed Nicholas to remain in his home environment and not just survive his many losses, but actually grow and succeed educationally, socially and emotionally."

The court found that Nicholas and Rebecca love each other, but their relationship is strained. Nicholas described his relationship with his mother to the GAL: "I don't know her. I have no connection to her. We rarely talk on the phone and when we do we talk for only a minute." The court found that Rebecca had not fulfilled her parental responsibilities since 2007, and that Nicolas remains "terribly upset" and angry about her abandonment of him. He also does not feel safe in her "environment." Rebecca and Nicholas have not seen each other on a consistent basis since 2007. They have not spent any substantial periods of time together since Nicholas's six-week trip to South Carolina in 2009.

While noting that, in the context of a guardianship proceeding, it was unnecessary to make a determination as to Rebecca's fitness as a parent, the trial court observed that the recent birth of Rebecca's youngest daughter was "surrounded by alleged confusion over the identification of [the baby's] birth father, her mother's ongoing drug use, and the baby's safety in her mother's care." Although Rebecca completed an intensive six-month drug rehabilitation program, the trial court disbelieved her claim that she entered this program because of one "aberrant" positive test result for marijuana during her pregnancy. Further, the trial court noted witness testimony that Rebecca was a "challenged mother" before 2007 and had mistreated Jonathan, Nicholas, and Danielle. Rebecca responded to this testimony "by calling the people making the accusations liars, including Jonathan and Nicholas."

At the hearing, Nicholas's sixth-grade teacher testified that he told her, "I don't even know my mom. I would be scared to live with her." The teacher also testified that Nicholas has strong friendships with his Dover classmates and a "really strong bond" with his brother. In contrast to Jonathan being "very involved" during Nicholas's sixth grade year, the teacher never heard from Rebecca. She expressed her opinion that it was in Nicholas's best interests to stay with his brother and friends. She also testified that she believed a move to South Carolina "would be damaging."

The GAL recommended that Nicholas remain in Dover with his brother: "It would be psychologically harmful to move Nicholas from his brother, friends, and Dover at this time." He observed mother and son during a joint interview and concluded that there was "no connection" between them.

Nicholas's counselor agreed that relocating to his mother's home in South Carolina would be psychologically harmful to Nicholas. She also reported that Nicholas was tearful, worried, and suffering from anxiety, sleeplessness, and headaches over the possible move. Nicholas said to her: "This is where I have been my whole life. My friends are here[,] and everyone is starting to really know me . . . . Why should I leave where I feel safe?"

As noted by the trial court, Rebecca became Nicholas's guardian by operation of law when Martin died. RSA 463:3, I (2004) ("Upon the death of either parent, the survivor shall be the sole guardian of the person of the minor."). Jonathan's petition to be substituted as guardian is governed by RSA 463:8, III(b) (Supp. 2010), which requires a non-parent seeking to establish guardianship over the objections of a parent to show "by clear and convincing evidence that the best interests of the minor require substitution or supplementation of parental care and supervision to provide for the essential physical and safety needs of the minor or to prevent specific, significant psychological harm to the minor." The trial court ruled that Jonathan had sustained his burden, and granted him sole guardianship of Nicholas. It also ordered the parties to negotiate Rebecca's parenting time with Nicholas to take place in South Carolina.

On appeal, the respondent argues that the trial court's award of guardianship of her son to a non-parent over her objections: (1) violated the guardianship of minors statute (RSA chapter 463); (2) violated her fundamental right to parent her child as guaranteed by Part I, Article 2 of the New Hampshire Constitution and the Fourteenth Amendment to the United States Constitution; and (3) was a *de facto* termination of her parental rights.

At the outset, we note that the respondent did not provide a record in support of her appeal. It is the burden of the appealing party to provide this court with a record sufficient to decide her issues on appeal. *See Rix v. Kinderworks Corp.*, 136 N.H. 548, 553 (1992); *see also* SUP. CT. R. 13. Absent a transcript of the hearing in the trial court, we must assume that the evidence was sufficient to support its decision. *See Bean v. Red Oak Prop. Mgmt.*, 151 N.H. 248, 250 (2004). We must also assume that the trial court made all findings necessary to support its decision. *In re Jonathan T.*, 148 N.H. 296, 304 (2002). We further note that the respondent does not

challenge the constitutionality of the guardianship statute. Accordingly, we review the trial court's order for legal errors only. *See Atwood v. Owens*, 142 N.H. 396, 397 (1997).

Parental rights are "natural, essential, and inherent" within the meaning of Part I, Article 2 of the New Hampshire Constitution. *In re Adam R.*, 159 N.H. 788, 792 (2010). "Similarly, the United States Supreme Court has recognized that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *In the Matter of R.A. & J.M.*, 153 N.H. 82, 90 (2005) (quotation omitted). Nevertheless, the fundamental rights of parents are not unassailable. *In re Adam R.*, 159 N.H. at 788.

Resolution of this appeal requires us to interpret RSA chapter 463, which governs guardianship of minors. We review the trial court's interpretation of a statute *de novo. Kenison v. Dubois*, 152 N.H. 448, 451 (2005). We are the final arbiter of the intent of the legislature as expressed in the words of the statute considered as a whole. *Id.* We first examine the language of the statute, and, where possible, we ascribe the plain and ordinary meanings to the words used. *Id.* When the language of a statute is clear on its face, its meaning is not subject to modification. *Dalton Hydro v. Town of Dalton*, 153 N.H. 75, 78 (2005). We will neither consider what the legislature might have said nor add words that it did not see fit to include. *Id.*

As to her first claim of error — that the trial court's decision violated the guardianship statute — the respondent appears to argue, first, that RSA 463:3, I, mandates that, upon the death of one parent, the surviving parent is entitled to guardianship of the minor unless she has been declared unfit. We reject this argument. RSA 463:8 plainly provides a procedure for the substitution of a non-parent guardian for a parent; that procedure does not require a court to find the parent unfit.

The respondent next argues that the trial court violated RSA 463:8 in several ways, including: (1) failing to identify the specific, psychological harm Nicholas would suffer under his mother's guardianship; (2) using erroneous legal standards; and (3) placing the burden of proof on her, as shown by the trial court's characterization of her as a "contestant." A review of the trial court's order does not support the respondent's contentions.

The trial court identified and applied the proper statutory standard — that is, whether Jonathan showed by clear and convincing evidence that Nicholas's best interests require substitute guardianship to provide for his essential physical and safety needs or to prevent specific, significant psychological harm to him. *See* RSA 463:8, III(b). Contrary to the

respondent's assertions, the guardianship statute does not require the non-parent to present expert witnesses to establish psychological harm to the minor. *Id.* Moreover, assuming, without deciding, that the trial court was required to make specific findings as to potential psychological harm, the trial court made such findings.

The trial court found that Nicholas and the respondent have not had regular, sustained contact, either in person or by telephone, since the respondent left the family in 2007. Nicholas stated that he did not know his mother and would be afraid to live with her. The trial court found that he is angry with her, does not feel safe in her "environment," and suffers from anxiety, sleeplessness, and headaches over the possible move. The respondent does not contest that Nicholas told "the Guardian ad litem, his therapist and his teacher, consistently and repeatedly, that he does not want to move."

The trial court found that it is Jonathan who has helped Nicholas to weather the painful blows of his mother's abandonment and his father's death. Nicholas has lived in Dover all his life, has strong bonds with his brother and friends in Dover, and says he feels "safe" in Dover.

We cannot agree with the respondent's contention that the trial court applied erroneous legal standards or shifted the burden of proof to her. The few phrases in the trial court's decision cited by the respondent do not support an inference that the trial court substituted its own standards for the statutory standard. For example, we interpret the trial court's use of the word "contestant" to describe the respondent as referring to the fact that she was contesting Jonathan's petition for guardianship, not as an indication that the trial court had shifted the burden of proof to her.

The respondent's second claim of error is that the trial court's decision violated her fundamental right to parent her child as guaranteed by Part I, Article 2 of the New Hampshire Constitution and the Fourteenth Amendment to the United States Constitution. We first consider her arguments under the State Constitution, using federal cases only to aid in our analysis. *State v. Ball*, 124 N.H. 226, 231-33 (1983).

Citing *Troxel v. Granville*, 530 U.S. 57 (2000), the respondent argues that the trial court was required to accord special weight to her assessment of what is best for Nicholas. We do not agree that the holding in *Troxel* requires reversal in this case. That decision involved a Washington state statute that allowed "any person" to petition for visitation rights and allowed courts to grant such visitation whenever "visitation may serve the best interest of the child." *Troxel*, 530 U.S. at 60. The United States Supreme Court concluded that the statute unconstitutionally infringed on

the parent's fundamental rights because it did not accord any weight to the parent's determination of what would be in the best interests of the child. *Id.* at 67.

Our statute, however, safeguards a parent's fundamental rights by imposing a high evidentiary standard — that is, by requiring a non-parent seeking a substitute guardianship to establish the need for it by clear and convincing evidence. While there is a presumption that fit parents act in the best interests of their children, that presumption is subsumed in the clear and convincing evidence standard. *See Hunter v. Hunter*, 771 N.W.2d 694, 706 (Mich. 2009) ("Although a fit parent is presumed to act in his or her child's best interests, a court need give the parent's decision only a 'presumption of validity' or 'some weight.' That is precisely what [the statute] does when it requires clear and convincing evidence to rebut the presumption.").

Because the State Constitution provides at least as much protection as the Federal Constitution under these circumstances, *see In re Jeffrey G.*, 153 N.H. 200, 204-05 (2006), we reach the same result under the Federal Constitution as we do under the State Constitution.

Finally, the respondent argues the trial court's order had the practical effect of terminating her parental rights, and, therefore, the trial court should have applied the standard set forth in RSA 170-C:5 (Supp. 2010) ("Grounds for Termination of the Parent-Child Relationship"). She alleges that, given the distance between her home in South Carolina and New Hampshire, she does not have the resources to visit with Nicholas and cannot exercise the parenting time awarded by the court. The respondent cites no legal authority for the proposition that her alleged inability to exercise visitation rights amounts to a *de facto* termination of parental rights.

> The appointment of a guardian is not a de facto termination of parental rights, which results in a final and complete severance of the child from the parent and removes the entire bundle of parental rights. . . . [A] guardian is subject to removal at any time.

*In re Guardianship of Elizabeth H.*, 771 N.W.2d 185, 193 (Neb. 2009).

Because, in the absence of a transcript, we review the trial court's decision for legal errors only, we do not address the respondent's argument that the GAL's report to the court is meritless. *See Atwood*, 142 N.H. at 396-97.

*Affirmed.*

DALIANIS, C.J., and DUGGAN, HICKS and LYNN, JJ., concurred.