Sullivan
No. 2011-647

IN RE C.M. & a.

Argued: March 13, 2012
Opinion Issued: June 29, 2012

*Elliott, Jasper, Auten, Shklar, & Wellman-Ally,* of Newport (*Michael Shklar* on the brief and orally), and *New Hampshire Legal Assistance,* of Manchester (*Elliott Berry* on the brief), for Larry M. and Sonia M.

*Michael A. Delaney,* attorney general (*Jeanne P. Herrick,* attorney, on the brief and orally), for New Hampshire Division for Children, Youth and Families.

*Wiggin & Nourie, P.A.,* of Manchester (*Doreen F. Connor* on the brief), and *Nutter McClennen & Fish LLP,* of Boston, Massachusetts (*Heather B. Repicky* on the brief), and American Bar Association, of Chicago, Illinois (*William T. Robinson III* on the brief), for the American Bar Association, as *amicus curiae.*

*Vivek S. Sankaran,* of Ann Arbor, Michigan, and *Tracy A. Bernson,* of Dover, by brief, for the National Association of Counsel for Children, as *amicus curiae.*

*Crusco Law Office PLLC,* of Bedford (*Kysa Crusco* on the brief), and Public Justice Center, of Baltimore, Maryland (*John Pollock* on the brief), for the National Coalition for a Civil Right to Counsel, as *amicus curiae.*

*Law Offices of Laura J. Brevitz,* of Raymond (*Laura J. Brevitz* on the brief), as *amicus curiae.*

HICKS, J. This case is before us on an interlocutory transfer without ruling from the Superior Court (*Tucker,* J.). *See* SUP. CT. R. 9. The trial court transferred the following question: "Does the Due Process Clause of the New Hampshire Constitution (Part I, Articles 2 and 15) or the Fourteenth Amendment of the Federal Constitution require the appointment of counsel for an indigent parent from whom the State seeks to take custody of a minor child based on allegations of neglect or abuse?" We conclude that while due process does not require the appointment of counsel in every such proceeding, the facts of a particular case may require the appointment of counsel.

We accept the facts as presented in the interlocutory transfer statement. *See In re Kotey M.,* 158 N.H. 358, 359 (2009). On April 14, 2011, Larry M. and Sonia M. (the parents) were served with petitions pursuant to RSA 169-C:7 (2002), by which the New Hampshire Division for Children, Youth and Families (DCYF) sought custody of their two minor children, C.M. and A.M. Two days earlier, the Newport Family Division, pursuant to an *ex parte* petition, had granted custody of the children to DCYF. *See* RSA 169-C:6 (2002 & Supp. 2011). DCYF alleged that the parents were neglecting their children by failing to provide a safe and sanitary home and adequate supervision and by exposing them to domestic violence in the form of threatening and intimidating behaviors by the father.

On April 15, the parents appeared at a preliminary hearing at which the court found that "reasonable cause exist[ed] to believe," RSA 169-C:15, I (2002), that the children were neglected and determined that the *ex parte* order granting custody of the children to DCYF should continue. The court appointed counsel to represent each of the parents. *See* RSA 169-C:10, II(a) (2002) (amended 2011).

An adjudicatory hearing was held on May 12, at which the parents were represented by appointed counsel. *See* RSA 169-C:18 (2002 & Supp. 2011). Following the hearing, the court found that both parents had neglected the children and continued the order granting legal custody to DCYF. On June 13, a dispositional hearing was held, at which both parents were represented by appointed counsel. *See* RSA 169-C:19 (2002 & Supp. 2011). Subsequently, the court issued an order maintaining legal custody of the children with DCYF and directing the parents to undertake certain measures before the children might be safely returned to them. Each parent filed an appeal to superior court and a *de novo* hearing was scheduled for August. *See* RSA 169-C:28 (2002).

Effective July 1, 2011, the legislature amended RSA 169-C:10, II(a), abolishing the statutory right to counsel for an indigent parent alleged to have abused or neglected his or her child. *See* Laws 2011, 224:77. Subsequently, the parents each filed a motion to continue court-appointed counsel, asserting that appointment of counsel for indigent parents in child abuse or neglect proceedings is constitutionally mandated under Part I, Articles 2 and 15 of the New Hampshire Constitution and the Fourteenth Amendment to the Federal Constitution.

■ Part I, Article 2 provides in part: "All men have certain natural, essential, and inherent rights — among which are, the enjoying and defending life and liberty; acquiring, possessing, and protecting, property; and, in a word, of seeking and obtaining happiness." N.H. CONST. pt. I, art. 2. Parental rights are "natural, essential, and inherent" within the meaning of this article. *In re Guardianship of Nicholas P.*, 162 N.H. 199, 203 (2011) (quotation omitted). "Similarly, the United States Supreme Court has recognized that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Id.* (quotation omitted).

■ Part I, Article 15 provides in part: "No subject shall be . . . deprived of his property, immunities, or privileges, put out of the protection of the law, exiled or deprived of his life, liberty, or estate, but by the judgment of his peers, or the law of the land." N.H. CONST. pt. I, art. 15. The phrase "law of the land" means due process of law. *State v. Veale*, 158 N.H. 632, 636 (2009).

We address this question first under the State Constitution, *State v. Ball*, 124 N.H. 226, 231 (1983), and cite federal opinions for guidance only. *Id.* at 232-33. We are the final arbiter of our constitution's due process requirements. *In re Father 2006-360*, 155 N.H. 93, 95 (2007).

█ In determining whether the State Constitution requires the appointment of counsel in a given proceeding, we employ the three-prong test articulated by the United States Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). *In re Kotey M.*, 158 N.H. at 361; *State v. Hall*, 154 N.H. 180, 182 (2006). This test balances: (1) the private interest affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail. *In re Brittany S.*, 147 N.H. 489, 491 (2002); *Mathews*, 424 U.S. at 335.

█ At the outset, the parents argue that based upon *In re Shelby R.*, 148 N.H. 237 (2002), "this Court must rule that Part I, Article 2 of the New Hampshire Constitution requires the appointment of counsel for indigent parents when the State seeks to take custody of their children pursuant to RSA Chapter 169-C." We decline, however, to apply that opinion as controlling precedent on the question before us. As pointed out in *Shelby R.* in the dissenting opinion of Justice Duggan, a decision by a plurality of an appellate court has no precedential value. *Shelby R.*, 148 N.H. at 248 (Duggan, J., concurring in part and dissenting in part); *see Foster v. Bd. of Sch. Com'rs of Mobile Cty., Ala.*, 872 F.2d 1563, 1569 n.8 (11th Cir. 1989) (noting that plurality opinion of United States Supreme Court is not binding); *Williams v. W.C.A.B. (Green Const. Co.)*, 687 A.2d 428, 430 n.2 (Pa. Commw. Ct. 1997) (recognizing that plurality opinion of state supreme court is not precedential). Accordingly, we address the transferred question as an issue of first impression and employ the three-prong balancing test set forth above.

As to the private interest of the parents, we have consistently recognized that the right to raise and care for one's children is a fundamental liberty interest protected by the State Constitution. *See, e.g., In re Father 2006-360*, 155 N.H. at 95; *In the Matter of Jeffrey G. & Janette P.*, 153 N.H. 200, 203 (2006); *Brittany S.*, 147 N.H. at 491; *Petition of Kerry D.*, 144 N.H. 146, 149 (1999); *State v. Robert H.*, 118 N.H. 713, 716 (1978), *reversed on other grounds by In re Craig T.*, 147 N.H. 739, 744-45 (2002). "[P]arental rights are natural, essential, and inherent rights within the meaning of the State Constitution," and "[t]he loss of one's children can be viewed as a sanction more severe than imprisonment." *In re Baby K.*, 143 N.H. at 205

(quotation omitted). Likewise, the United States Supreme Court has determined "that a parent's desire for and right to the companionship, care, custody, and management of his or her children is an important interest that undeniably warrants deference and, absent a powerful countervailing interest, protection." *Lassiter v. Department of Social Services*, 452 U.S. 18, 27 (1981) (quotation omitted). This interest "is perhaps the oldest of the fundamental liberty interests recognized" by the Court. *Troxel v. Granville*, 530 U.S. 57, 65 (2000).

■ As the State acknowledges in its brief, "[t]he primary private interest of a parent alleged to have abused or neglected his or her child is the parent-child relationship," and,

> [u]ndoubtedly, the provisions of RSA chapter 169-C have an [e]ffect on a parent's right to raise and care for his or her child. For example, where the court has made a finding of abuse or neglect, the court may issue orders that permit the child to remain with the parents subject to conditions including supervision of parents by DCYF, participation of parents in therapy or medical treatment, and assistance of homemakers or parent aides. *See* RSA 169-C:19, I. The court may also order that legal custody of the child ... be temporarily transferred to DCYF or a relative. *See* RSA 169-C:19, III.

Given that it is undisputed that the private interest affected is a fundamental liberty interest, we next consider whether the procedures at issue create the risk of an erroneous deprivation of this protected liberty interest, "and the probable value, if any, of additional or substitute procedural safeguards." *Petition of Preisendorfer*, 143 N.H. 50, 53 (1998) (quotation omitted). In the context of the issue before us, we examine whether the absence of counsel impermissibly increases the risk of an erroneous result in a child abuse or neglect proceeding under RSA chapter 169-C, thereby depriving the parents of the right to the care and custody of their children.

Pursuant to RSA chapter 169-C, when allegations of child abuse or neglect have been made, if the trial court finds reasonable cause that the allegations are founded, it must hold an adjudicatory hearing. *See* RSA 169-C:15, III(d) (Supp. 2011). At an adjudicatory hearing, the petitioner must present witnesses to testify and any other evidence in support of the petition. RSA 169-C:18, III. The parents "have the right to present evidence and witnesses on their own behalf and to cross-examine adverse witnesses." *Id.* The court is not bound by the technical rules of evidence and may admit evidence that it considers relevant and material. RSA 169-C:12

(2002). The proceedings are held in a closed courtroom before a judge without a jury. RSA 169-C:14 (Supp. 2011), :18.

The parents argue that without appointed counsel to represent them, the procedures set forth in the statute for the initial adjudicatory hearing create the risk of an erroneous deprivation of their protected liberty interest because of the relatively low preponderance of the evidence standard and because few parents are equipped to understand and confute expert medical and psychiatric testimony. In addition, the parents contend that the absence of the technical rules of evidence elevates the risk of erroneous deprivation in that the common use of hearsay evidence to support the State's claim of abuse and neglect "neutralizes any mitigation of the risk of erroneous deprivation that the lack of technical rules of evidence might provide."

The State argues that because the rules of evidence do not apply, the parents are not burdened by difficult questions of evidentiary law, and because the proceedings are held in a closed courtroom without a jury, the parents can present their case "free from the distraction created by members of the public and the complications of a jury trial." The State also argues that the statute provides procedural protections that reduce the risk of erroneous deprivation in that: the court's orders are subject to regular review, *see* RSA 169-C:22 (2002), :24 (Supp. 2011); the parents are provided with a notice explaining the nature of the hearings and their possible consequences, *see* Form NHJB-2192-DF, *available at* http://www.courts.state.nh.us/forms/nhjb-2192-df.pdf (07/01/2011); and the court must determine at the preliminary hearing that each parent "understands the possible consequences to parental rights should the court find that the child is abused or neglected," RSA 169-C:15, IV (2002).

■ ■ We underscore that a child abuse or neglect proceeding is not synonymous with a proceeding to terminate parental rights under RSA chapter 170-C. Abuse or neglect proceedings and termination of parental rights proceedings have distinct and separate purposes. In proceedings to terminate parental rights, the purpose of which is to permanently sever the parent-child relationship, the standard of proof is beyond a reasonable doubt and indigent parents have a right to court-appointed counsel. *See* RSA 170-C:10 (2002); *In re Baby K.*, 143 N.H. at 205. The overriding goal of abuse or neglect proceedings is to reunify the family. *See* RSA 169-C:2 (2002). Unlike in proceedings to terminate parental rights, in abuse or neglect proceedings the deficiencies that formed the basis for the initial petition may be rectified and the parental ties are not permanently severed. The provisions of RSA chapter 169-C are intended to achieve the purposes of

keeping a child in contact with his home community and in a family environment by preserving the unity of the family and separating the child from his parents only when the safety of the child is in danger or when it is clearly necessary for his welfare or the interests of the public safety and when it can be clearly shown that a change in custody and control will plainly better the child.

RSA 169-C:2, II(b). To comply with the provisions of RSA chapter 169-C, the State must "[p]rovide assistance to parents to deal with and correct problems in order to avoid removal of children from the family." RSA 169-C:2, I(c).

■ The trial court may not terminate parental rights in an abuse or neglect proceeding, see RSA 169-C:24-a (Supp. 2011), and its "dispositional order is not permanent and is subject to review," *In re Father 2006-360*, 155 N.H. at 97. As other jurisdictions have similarly concluded, while an abuse or neglect proceeding is a first step in a process that may ultimately result in termination of parental rights, such a result is by no means a foregone conclusion. *See, e.g., Smith v. Marion County DPW*, 635 N.E.2d 1144, 1148 (Ind. Ct. App. 1994) (entry of a child in need of services "decree does not necessarily pave the path to a termination of the parent-child relationship"); *State in Interest of C.V. v. T.V.*, 499 So. 2d 159, 162 (La. Ct. App. 1986) (State sought temporary custody of the child only until the parents could be taught parenting skills; permanent removal was not even considered until extensive efforts to rehabilitate the parents proved unsuccessful); *Matter of Perry*, 385 N.W.2d 287, 292 (Mich. Ct. App. 1986) ("the fact that an adjudicative hearing is the first and a necessary step in a juvenile court neglect proceeding is of little moment" as not every hearing precedes or results in a decision to terminate parental rights).

■ Under the procedures contained in RSA chapter 169-C, a parent charged with abuse or neglect is provided a full hearing with an opportunity to call witnesses, present evidence, and cross-examine adverse witnesses. *See* RSA 169-C:18, III. The statute also requires that the trial court determine whether each parent understands the possible consequences to parental rights should the court find that the child is abused or neglected and each parent is required to sign a statement that he or she understands the consequences to parental rights. RSA 169-C:15, IV; *see* Form NHJB-2192-DF, *available at* http://www.courts.state.nh.us/forms/nhjb-2192-df.pdf (07/01/2011) (notice to accused parent). Although there is a relaxed evidentiary standard in neglect or abuse proceedings, evidence nevertheless must be material and relevant. *In re Gina D.*, 138 N.H. 697, 700-01 (1994).

 Contrary to the parents' argument that the statutory procedures increase the risk of erroneous deprivation, we have previously concluded that the fact that the court is not bound by the technical rules of evidence and that the proceedings are held before a judge without a jury actually *reduces* the risk that a parent will suffer an erroneous deprivation of his or her liberty interest. *In re Father 2006-360,* 155 N.H. at 97; *Brittany S.,* 147 N.H. at 493. We adhere to our prior decisions and conclude that the procedures set forth in RSA chapter 169-C are facially sufficient to prevent the risk of an erroneous deprivation of a parent's fundamental liberty interest in the care and custody of his or her children.

The third prong of the due process analysis takes into account "the government's interest, considering the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail." *Preisendorfer,* 143 N.H. at 53 (quotation omitted). RSA chapter 169-C was enacted "to provide protection to children whose life, health or welfare is endangered and to establish a judicial framework to protect the rights of all parties involved in the adjudication of child abuse or neglect cases." RSA 169-C:2, I. Pursuant to the statute, "[e]ach child coming within the provisions of this chapter shall receive, preferably in his own home, the care, emotional security, guidance and control that will promote the child's best interest; and, if the child should be removed from the control of his parents, guardian or custodian, adequate care shall be secured for the child." *Id.* The statute

seeks to coordinate efforts by state and local authorities, in cooperation with private agencies and organizations, citizens' groups, and concerned individuals, to:

(a) Protect the safety of the child.

(b) Preserve the unity of the family whenever possible.

(c) Provide assistance to parents to deal with and correct problems in order to avoid removal of children from the family.

(d) Take such action as may be necessary to prevent abuse or neglect of children.

(e) Provide protection, treatment and rehabilitation, as needed, to children placed in alternative care.

*Id.* The chapter is to "be liberally construed to the end that its purpose may be carried out . . . [t]o provide effective judicial procedures through which

the provisions of this chapter are executed and enforced and which recognize and enforce the constitutional and other rights of the parties and assures them a fair hearing." RSA 169-C:2, II(c).

Thus, under the objectives stated in the statute, the State shares the parents' interest in maintaining the parent-child relationship. The State also shares an interest in a proceeding that produces fair results. The State's interest diverges, however, when it comes to the fiscal burden associated with appointed counsel. The State represents that in fiscal years 2010 and 2011, it expended more than one million dollars on appointed counsel and that that "expense must be viewed in light of the other expenses the State incurs in protecting the interest of children subjected to abuse or neglect proceedings." While the State's fiscal concern may be legitimate, "it is hardly significant enough to overcome private interests as important as those here." *Lassiter*, 452 U.S. at 28.

■ To summarize, the fundamental nature of the parents' interest favors the appointment of counsel. As set forth above, however, the procedural protections embodied in the statute prevent the risk that an uncounseled parent will be erroneously deprived of the care and custody of his or her child. In addition, because the State in its role as *parens patriae* has a significant interest in protecting the best interest of children and providing reasonable services to assist with the statutory goal of family reunification, the State shares with the parents a desire for a correct result. For these reasons we conclude that, on balance, due process does not require that indigent parents have a *per se* right to appointed counsel in abuse or neglect proceedings under RSA chapter 169-C.

We agree with the State that the facts and circumstances of a particular case may require the appointment of counsel to adequately protect a parent's right to due process. As the State acknowledges, there may be abuse or neglect cases that, for example, present complicated legal issues or require expert testimony, and given that "[p]arents involved in such cases are likely people who are not equipped to understand or challenge such testimony . . . the presence of counsel could make a determinative difference in the outcome."

■ Accordingly, we conclude that while due process does not require that counsel be appointed for indigent parents in every proceeding brought under RSA chapter 169-C, a determination of whether appointed counsel is necessary to adequately reduce the risk of erroneous deprivation should be made on a case-by-case basis in the first instance by the trial court. *See, e.g.,* *In Interest of D.B.*, 385 So. 2d 83, 91 (Fla. 1980) (counsel will always be required for parents where permanent termination of custody might result, but where there is no threat of permanent termination of parental custody,

the right to counsel should be determined on a case-by-case basis); *Matter of Perry*, 385 N.W.2d at 292-93 (case-by-case analysis whether due process requires court-appointed counsel in a neglect proceeding).

The Federal Constitution offers no greater protection than the State Constitution under these circumstances, *see In re Tracy M.*, 137 N.H. 119, 122 (1993); *Lassiter*, 452 U.S. at 31-32. Thus, we reach the same result under the Federal Constitution as we do under the State Constitution.

*Remanded.*

LYNN, J., concurred specially; CONBOY, J., dissented.

LYNN, J., concurring specially. I concur in the result reached in Justice Hicks's decision, but write separately to address more fully my reasons for disagreeing with the dissenting opinion.

In *Lassiter v. Department of Social Services*, 452 U.S. 18, 31-32 (1981), the United States Supreme Court held that there is no automatic right to appointed counsel for an indigent parent in a parental rights termination proceeding. The Court, drawing upon its prior case law, concluded that there is a presumption that "an indigent litigant has a right to appointed counsel only when, if he loses, he may be deprived of his physical liberty." *Lassiter*, 452 U.S. at 26-27. While recognizing that parental rights are very important, the Court explained that whether due process demanded appointed counsel should be decided on a case-by-case basis by, first, balancing the factors set forth in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), and, second, balancing the net result of that calculation "against the presumption that there is no right to appointed counsel in the absence of at least a potential deprivation of physical liberty." *Id.* at 31. Only where the result of this analysis demonstrates that the absence of counsel in a particular case renders the proceedings fundamentally unfair is a due process violation established. *Id.* at 33.

I would not expand the right to counsel in non-criminal cases under our State Constitution beyond that recognized under the Federal Due Process Clause. The dissent would create a right under the State Constitution that extends well beyond *Lassiter* because not only does the dissent envision a *per se* right, but it also would apply that right both to parental rights termination proceedings — the kind at issue in *Lassiter* — *and* to abuse or neglect proceedings — those where the parent is not exposed to a permanent deprivation of his or her rights as a parent. *See* RSA 169-C:2 (2002). The dissent's position is at odds with our prior case law, which, consistent with *Lassiter*, has not found a *per se* right to counsel to exist outside the strict confines of direct criminal proceedings in which the accused is facing charges that may result in incarceration. *See State v. Hall*,

154 N.H. 180, 184-85 (2006) (no *per se* right to counsel for criminal defendant seeking new trial in collateral proceeding); *In re Brittany S.*, 147 N.H. 489, 493 (2002) (no *per se* right to counsel in proceeding by parent to terminate guardianship over minor child); *State v. Cook*, 125 N.H. 452, 459-60 (1984) (no *per se* right to counsel at hearing to determine one's status as a habitual offender); *Duval v. Duval*, 114 N.H. 422, 426-27 (1974) (no *per se* right to appointed counsel in civil contempt proceeding).

In my view, the dissent's position raises concerns that go to the heart of the judicial function. It is not difficult to understand why the *Lassiter* Court may have been unwilling to rely solely on the *Mathews* procedural due process factors in resolving that case: The right at issue in that case, and this one, is not simply procedural, but also has a significant substantive component. That is, the parents do not simply claim the right to be represented by counsel in the instant abuse or neglect proceedings — the legislature in fact has done nothing to interfere with *that* right; instead, they claim the right to have the State provide them with this service at the expense of the taxpayers. In other words, the parents claim the right to an economic entitlement.

Except in the individual case where fundamental fairness requires such an appointment, I would not extend the right to appointed counsel beyond the criminal law context because, once such a right is recognized in civil proceedings, it is hard to conceive of appropriate limiting principles. Although the interest of a parent in raising a child is unquestionably of fundamental importance, it is easy to envision other governmental actions that, as a practical matter, may have as devastating an effect on this right as the bringing of an abuse or neglect petition. Take a case as simple as that of a parent residing in northern New Hampshire, where public transportation is virtually non-existent, who is facing an administrative license revocation proceeding. If the parent loses his driver's license, it is not difficult to imagine that this could effectively preclude him from maintaining employment, and in turn from supporting his children. Does such a person have a right to insist that the State bear the cost of providing him with an attorney at the revocation hearing? *Cf. Bell v. Burson*, 402 U.S. 535, 539-40 (1971) (holding that, in the context of the suspension of a State-granted driver's license, due process requires that pre-suspension hearing involve probable cause determination as to the fault of the licensee, but hearing need not take the form of a full hearing on question of liability). Or what of an indigent parent in a divorce proceeding who is facing a represented opponent bent on preventing her from having any substantial residential time with her child? While this may be thought of as a private proceeding rather than, as here, one initiated by the State, the fact that the court — an arm of the State — is the instrumentality through which the

deprivation of custody is implemented could be deemed sufficient State action to bring due process into play. *Cf. Fuentes v. Shevin*, 407 U.S. 67, 80-82 (1972) (applying constitutional due process analysis to State replevin actions); *Shelley v. Kraemer*, 334 U.S. 1, 20 (1948) (holding that granting judicial enforcement of privately created racially restrictive covenants violates Equal Protection Clause). Is the parent in this hypothetical entitled to insist that the State pay for the services of an attorney to represent her?

In the early part of the last century, the United States Supreme Court interpreted the broad and general language of the Due Process Clauses of the Fifth and Fourteenth Amendments as protecting property and contract rights that were nowhere specified in those amendments. *See generally Lochner v. New York*, 198 U.S. 45 (1905). Eventually, in the New Deal era, the Court corrected the notion that full-bore capitalism absent any significant regulation of property rights was the only economic system our Constitution allowed. *See West Coast Hotel Co. v. Parrish*, 300 U.S. 379, 391 (1937). But just as the Due Process Clauses of the State and Federal Constitutions do not cabin the legislature within a system of unrestrained laissez-faire, neither are they a repository of unelaborated collectivism under which courts can require the State to provide an ever increasing array of services exempt from the control of the political branches of government. *Cf. Harris v. McRae*, 448 U.S. 297, 317-18 (1980) ("Although the liberty protected by the Due Process Clause affords protection against unwarranted government interference . . . , it does not confer an entitlement to such [government] funds as may be necessary to realize all the advantages of that freedom."). *But cf. Claremont School Dist. v. Governor*, 142 N.H. 462, 472-73 (1997) (divining within Part II, Article 83 of the New Hampshire Constitution the existence of a constitutional right to have the state provide and pay for an "adequate" education for school age children). On this score, the words of Justice White bear repeating:

> The Judiciary, including this Court, is the most vulnerable and comes nearest to illegitimacy when it deals with judge-made constitutional law having little or no cognizable roots in the language or even the design of the Constitution. Realizing that the present construction of the Due Process Clause represents a major judicial gloss on its terms, as well as on the anticipation of the Framers, and that much of the underpinning for the broad, substantive application of the Clause disappeared in the conflict between the Executive and the Judiciary in the 1930's and 1940's, the Court should be extremely reluctant to breathe still further substantive content into the Due Process Clause so as to strike down legislation adopted by a State or city to promote its welfare.

Whenever the Judiciary does so, it unavoidably pre-empts for itself another part of the governance of the [state] without express constitutional authority.

*Moore v. East Cleveland*, 431 U.S. 494, 544 (1977) (*White*, J., dissenting).

The three *Mathews* factors that we utilize in addressing due process questions are surely among the same considerations the legislature must have weighed in determining whether to appropriate funds for counsel for accused indigent parents in abuse or neglect proceedings. In my view, the legislature's call on this question is due substantial deference, not only because it has an obligation equal to our own to comply with the State and Federal Constitutions, *see Arizona Christian School Tuition Org. v. Winn*, 131 S. Ct. 1436, 1442 (2011), and its judgment as a co-equal branch of government is due great respect, but also because in making that judgment it has access to far more information than we do, and must act based on a far broader perspective than we can readily appreciate in our role as adjudicators of discrete cases. *See Turner Broadcasting Systems, Inc. v. FCC*, 520 U.S. 180, 195-96 (1997). Specifically, the legislature must compare the costs versus benefits of providing and paying for counsel in abuse or neglect cases against a vast array of other programs and interests, all of which are vying for funding, while also making judgments as to what level of resources the public can reasonably be called upon to provide through taxation. We must presume it accomplished these tasks in this case and came to the conclusion that, from its global perspective, continuing to supply court-appointed counsel to indigent parents in abuse or neglect cases was not in the overall public interest. We should not second-guess that judgment.

Providing counsel at State expense to indigent parents facing abuse or neglect proceedings may well represent enlightened public policy. *See Lassiter*, 452 U.S. at 33. However, except insofar as the denial of counsel to an indigent accused parent in a particular State-initiated abuse or neglect case results in fundamental unfairness, whether to provide this entitlement or not is a matter for the legislature to decide.

CONBOY, J., dissenting. After recognizing for over thirty years a statutory right to counsel for indigent parents in abuse or neglect proceedings, New Hampshire apparently has become the only state in the country to abolish this right. Because I conclude that the due process protections afforded under the New Hampshire Constitution require the appointment of counsel for indigent parents in State-initiated proceedings brought pursuant to RSA chapter 169-C, I respectfully dissent.

Part I, Article 2 of the New Hampshire Constitution provides that "All men have certain natural, essential, and inherent rights — among which

are, the enjoying and defending life and liberty; acquiring, possessing, and protecting, property; and, in a word, of seeking and obtaining happiness." N.H. CONST. pt. I, art. 2. We have recognized that parental rights are "natural, essential, and inherent" within the meaning of this constitutional provision. *See In re Guardianship of Nicholas P.*, 162 N.H. 199, 203 (2011). Thus, to determine whether the due process requirements of the State Constitution mandate the appointment of counsel in this case, our law requires analysis under a three-prong balancing test. *In re Brittany S.*, 147 N.H. 489, 491 (2002). This balancing test considers:

> (1) the private interest affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, considering the function involved and the fiscal and administrative burdens that additional or substitute procedural requirements would entail.

*Id.*

As to the first prong, the importance of the private interest affected here cannot be overstated as "[t]he family entity is the core element upon which modern civilization is founded." *In re Welfare of Luscier*, 524 P.2d 906, 907 (Wash. 1974). The rights to conceive and to raise one's children have been deemed "essential," *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923), "basic civil rights of man," *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942), and "[r]ights far more precious . . . than property rights." *May v. Anderson*, 345 U.S. 528, 533 (1953). Our decisions leave no doubt that parental rights are fundamental rights protected by the State Constitution and that the role of parents in the life of a family is a fundamental human right and liberty. *State v. Robert H.*, 118 N.H. 713, 716 (1978), *overruled on other grounds by In re Craig T.*, 147 N.H. 739, 744-45 (2002); *see In re Father 2006-360*, 155 N.H. 93, 95 (2007); *Petition of Kerry D.*, 144 N.H. 146, 148 (1999); *Stanley D. v. Deborah D.*, 124 N.H. 138, 142 (1983). The fundamental nature of a parent's liberty interest "has been long recognized in termination of parental rights and abuse [or] neglect proceedings." *In re Brittany S.*, 147 N.H. at 491.

Given the indisputable significance of the individual liberty interest at issue, determining whether due process requires appointed counsel for indigent parents in abuse or neglect proceedings requires consideration of the nature of the proceeding, including both the risk of error if the additional protection is not provided and the burdens created by its imposition. *See Petition of Preisendorfer*, 143 N.H. 50, 53 (1998). An examination of the statutory scheme illustrates why, given the potential

consequences of a finding of abuse or neglect, indigent parents are entitled to the assistance of counsel to prevent the erroneous deprivation of their fundamental right "to make decisions concerning the care, custody, and control of their children." *In re Guardianship of Nicholas P.*, 162 N.H. at 203 (quotation omitted).

Once an *ex parte* order is issued or a petition alleging child abuse or neglect is filed, a preliminary hearing is held to determine if reasonable cause exists to believe that the child is abused or neglected. RSA 169-C:15, I (Supp. 2011). Upon a finding of reasonable cause that the child is abused or neglected, the trial court must: appoint a Court Appointed Special Advocate (CASA) or other qualified *guardian ad litem* or an attorney to represent the child; determine whether any *ex parte* orders issued should be continued or modified; issue immediate written orders if the court finds that the child's circumstances or surroundings present an imminent danger to the child's health or life; and set a date for an adjudicatory hearing. RSA 169-C:15, III(a)-(d) (Supp. 2011).

The adjudicatory hearing must be held, completed, and written findings issued within sixty days from the date the petition was filed with the court. RSA 169-C:15, III(d) (Supp. 2011). If the child is in an out-of-home placement, the adjudicatory hearing must be held and completed within thirty days from the date the petition was filed, unless the court makes a written finding of "extraordinary circumstances requiring the time limit to be extended." *Id.* The court is required to determine whether each parent summoned understands the possible consequences to parental rights should the court find that the child is abused or neglected, and each parent is required to sign a statement acknowledging that he or she understands the consequences to parental rights. RSA 169-C:15, IV (Supp. 2011). If the court finds sufficient facts to sustain the petition, the court may: permit the child to remain with the parent, relative, guardian, or other custodian; transfer legal supervision to a child placing agency; transfer protective supervision to a child placing agency; and/or issue an order of protection setting forth conditions of behavior by a parent, relative, guardian, custodian, or a household member. RSA 169-C:16, I(a)-(d) (Supp. 2011). If the court issues a protective order, it is entered into the state database and made available to the police and sheriffs' departments statewide. RSA 169-C:16, I (Supp. 2011).

At the adjudicatory hearing, the petitioner must present witnesses to testify in support of the petition and any other evidence necessary to support the petition. RSA 169-C:18, III (Supp. 2011). The parents have the right to present evidence and witnesses on their own behalf and to cross-examine adverse witnesses. *Id.* The court is not bound by the technical rules of evidence and may admit evidence that it considers

relevant and material. RSA 169-C:12 (2002). If the court finds that a child has been abused or neglected, the court must order a child placing agency to conduct an investigation and prepare a written social study to be submitted to the court prior to the final disposition of the case. RSA 169-C:18, V (Supp. 2011). If facts sufficient to sustain the petition are established, the court must enter a written order finding that the child has been abused or neglected. RSA 169-C:21, I (2002). The court's order must include conditions the parents must meet before the child is returned home. RSA 169-C:21, II (2002). The court's order must also include a specific plan, to include the services the child placing agency will provide to the child and family. *Id.*

A hearing on final disposition must be held within thirty days after a finding of neglect or abuse. RSA 169-C:18, VII (Supp. 2011). In its dispositional order, the court may: order that the child is permitted to remain with the parents, guardian, relative, or other custodian, subject to any or all of the conditions enumerated in the statute; issue an order of protection setting forth conditions of behavior by a parent, relative, sibling, guardian, custodian or a household member; transfer legal custody to a child placing agency or relative; and/or order any parent, guardian, relative, custodian, household member, or child to undergo individual or family therapy, or medical treatment. RSA 169-C:19, I-IV (Supp. 2011). Before a child in an out-of-home placement is returned to the custody of his or her parents, the parents must demonstrate to the court that: they are in compliance with the outstanding dispositional court order; the child will not be endangered in the manner adjudicated on the initial petition, if returned home; and return of custody is in the best interest of the child. RSA 169-C:23 (2002).

The court must conduct an initial review hearing within three months of the dispositional hearing to review the status of all dispositional orders and may conduct additional review hearings upon its own motion or upon the request of any party at any time. RSA 169-C:24, I (Supp. 2011). At the review hearing, the court must determine whether the New Hampshire Division for Children, Youth and Families (DCYF) has made reasonable efforts to finalize the permanency plan that is in effect. RSA 169-C:24, II (Supp. 2011). Where reunification is the permanency plan, the court must consider whether services to the family have been "accessible, available, and appropriate." *Id.*

When a child has been in an out-of-home placement for twelve or more months, the court must hold a permanency hearing within twelve months of a finding of abuse or neglect. RSA 169-C:24-b, I (Supp. 2011). At the permanency hearing, the court must determine whether the child will be returned to his or her parent(s) pursuant to the standard set forth in RSA

169-C:23. RSA 169-C:24-b, II (Supp. 2011). If the standard for return is not met, the court must identify a permanency plan other than reunification, including: termination of parental rights; surrender of parental rights and adoption; guardianship with a relative; or another planned permanent living arrangement. *Id.* The court must also determine whether DCYF has made "reasonable efforts to finalize the permanency plan that is in effect" and "whether services to the family have been accessible, available and appropriate." RSA 169-C:24-b, III (Supp. 2011).

Viewing this statutory scheme as a whole, an initial petition alleging abuse or neglect sets in motion a series of hearings that can result in the immediate loss of custody of a child for up to one year or longer and may ultimately result in termination of parental rights. As other jurisdictions have recognized, such statutory schemes establish a continuum of proceedings that begin with allegations of abuse or neglect and end with petitions to terminate parental rights. *See, e.g., In re Hudson,* 763 N.W.2d 618, 624 (Mich. 2009) (Corrigan, J., concurring) (a child protective proceeding is a single continuous proceeding; in deciding whether to terminate parental rights, a trial court considers evidence admitted at all dispositional and review hearings); *Watson v. Division of Family Services,* 813 A.2d 1101, 1106 (Del. 2002) (when the State files a petition to terminate parental rights, it is the end stage in a continuum that usually begins with a dependency and neglect proceeding).

Although an abuse or neglect proceeding does not itself terminate parental rights, "it is an interference with the parental relationship and often a precursor to the permanent termination of parental rights." *Z.T. v. M.T.,* 258 S.W.3d 31, 34 (Ky. Ct. App. 2008).

> Practically speaking, once the State has become involved in the parent/child relationship through a . . . dependency proceeding, there is a substantial possibility that the parent may lose custody of the child or be separated from the child for significant periods of time. Like termination proceedings, dependency proceedings may work a unique kind of deprivation. Indeed, they are frequently the first step on the road to permanent severance of parental ties. A parent who is unable to present an adequate defense from the outset may be seriously disadvantaged later.

*In re Emilye A.,* 12 Cal. Rptr. 2d 294, 301 (Ct. App. 1992) (citations omitted). Thus, the constitutionally protected "natural, essential, and inherent right[ ]," *Robert H.,* 118 N.H. at 716, to raise and care for one's child is in jeopardy from the outset of a finding under RSA 169-C:15, I, that reasonable cause exists to believe that a child is abused or neglected. *See R.V. v. Com. Dept. for Health and Family,* 242 S.W.3d 669, 672-73 (Ky. Ct.

App. 2007) (because the proceedings in a dependency action greatly affect any subsequent termination proceeding, parents must be represented by counsel at every critical stage, including an underlying dependency proceeding); *In re Welfare of Myricks*, 533 P.2d 841, 842 (Wash. 1975) (extending the right of indigent parents to court-appointed counsel to temporary deprivation proceedings where permanent deprivation may likely follow the dependency and neglect proceeding); *Crist v. Division of Youth and Family Services*, 320 A.2d 203, 211 (N.J. Super. Ct. Law Div. 1974) (indigent parents subjected to dependency proceedings looking toward temporary loss of custody are entitled to appointed counsel since the proceeding for temporary custody is frequently a prelude to a petition to terminate parental rights), *affirmed in part and reversed in part on other grounds*, 343 A.2d 815 (N.J. Super. Ct. App. Div. 1975).

The risk of an erroneous deprivation in abuse or neglect proceedings is especially likely when an indigent parent is involved.

> In dependency and child neglect proceedings — even if only preliminary to later and more final pronouncements — the indigent parent has to face the superior power of State resources. The full panoply of the traditional weapons of the State are trained on the defendant-parent, who often lacks formal education, and with difficulty must present his or her version of disputed facts; match wits with social workers, counselors, psychologists, and physicians and often an adverse attorney; cross-examine witnesses (often expert) . . . ; deal with documentary evidence he or she may not understand, and all to be done in the strange and awesome setting of the juvenile court.

*In re Welfare of Myricks*, 533 P.2d at 842; *see In Interest of Howard*, 382 So. 2d 194, 200 (La. Ct. App. 1980) (noting the imbalance of the power and ability of the State to present its side of the case as opposed to that of the parents); *Danforth v. State Department of Health & Welfare*, 303 A.2d 794, 799 (Me. 1973) (for most parents involved in neglect actions, the entire proceedings are incomprehensible).

As the record in the case before us establishes, Sonia M., the natural mother, completed high school with special education accommodations and later completed coursework to obtain a Licensed Practical Nurse certificate. She is unemployed and suffers from severe depression. Larry M., the natural father, completed the tenth grade of high school with special education accommodations before discontinuing his education. He is at least partially disabled, is blind in one eye, and receives Social Security Disability benefits. Yet in order to present an effective defense to the allegations of abuse or neglect, these parents are expected, on their own, to

identify material issues, cross-examine adverse witnesses, challenge irrelevant or immaterial testimony, present evidence, and elicit relevant information from their own witnesses. Without counsel, "[t]he parent who actually has achieved the improvement or quality of parenting the State would require may be unable to establish this fact. The parent who has failed in these regards may be unable to demonstrate cause, absence of willfulness, or lack of agency diligence as justification." *Lassiter v. Department of Social Services*, 452 U.S. 18, 46 (1981) (Blackmun, J., dissenting). "[E]rrors of fact or law in the State's case may go unchallenged and uncorrected." *Id.* In addition, because each hearing lays the foundation for each subsequent hearing, any errors that occur can affect the entire proceeding and, consequently, a subsequent termination of parental rights proceeding.

> When a termination proceeding is commenced, the factual basis for terminating parental rights is found in the conduct that occurred from the time that child was placed in foster care until the State concluded that the efforts at reunification had failed. If an attorney is only appointed to represent an indigent parent after the petition to terminate has been filed then the outcome is almost inevitable, assuming the factual allegations in the petition to terminate can be established with credible evidence.

*Watson*, 813 A.2d at 1106.

Without counsel, a parent's fundamental liberty interest is threatened at every phase of an abuse or neglect proceeding. "The right to one's child is too basic to expose to the State's forces without the benefit of an advocate. The fact that the instant case involves a non-permanent deprivation of the child does not justify denying counsel." *In re Welfare of Myricks*, 533 P.2d at 842. Further, appointment of counsel in termination proceedings, *see* RSA 170-C:10 (2002), does not vitiate the denial of due process in an underlying abuse or neglect proceeding. I would hold that the risk of an erroneous result is untenable in light of the fundamental interest at stake. As the United States Supreme Court has acknowledged, "[i]nformed opinion has clearly come to hold that an indigent parent is entitled to the assistance of appointed counsel not only in parental termination proceedings, but in dependency and neglect proceedings as well." *Lassiter*, 452 U.S. at 33-34. I note that this court has previously determined that, at the very least, appointment of counsel may be required to adequately protect a stepparent's right to due process in an abuse or neglect proceeding. *See In re Shelby R.*, 148 N.H. 237 (2002) (the plurality, however, called for a *per se* rule, entitling an indigent stepparent to appointment of counsel).

The State's interest, considering the function involved and the fiscal and administrative burdens that additional or substitute procedural requirements would entail, does not outweigh the risk of an erroneous deprivation of the fundamental right at issue. *See Petition of Preisendorfer*, 143 N.H. at 53. The State's interest as identified in RSA chapter 169-C includes the protection of children and the establishment of a judicial framework that "protect[s] the rights of *all* parties involved in the adjudication of child abuse or neglect cases." RSA 169-C:2, I (2002) (emphasis added). Now, however, as a result of the abolishment of the thirty-year-old statutory right to counsel, the *only* parties in an abuse or neglect proceeding who are *not* provided with representation are the indigent parents.

The United States Department of Health and Human Services has adopted guidelines which "draw upon the best practices among the States, and are meant to help States evaluate and modernize their laws that affect children and families." D. Duquette & M. Hardin, *Guidelines for Public Policy and State Legislation Governing Permanence for Children*, U.S. Dept. of Health and Human Services, I-1 (1999, adopted 2002) (Guidelines). The Guidelines state that "[c]hildren's interests are not well served unless *all* parties have good legal representation." *Id.* at VII-1. The Guidelines emphasize that

> [c]ourts face difficult decisions about how best to protect children and judges need to be confident that they are reaching the best-informed decision about a child's future. Given that attorneys and other advocates often determine what information a judge is presented with, it is vital that all parties in child abuse and neglect cases have adequate access to competent representation so that judges can make informed decisions.

*Id.* (quotation omitted). Accordingly, the Guidelines specifically recommend that "States guarantee that counsel represent biological parents (or legal guardians) at all court hearings, including at the preliminary protective proceeding. Such representation should be provided at government expense when the parent or guardian is indigent." *Id.* at VII-5.

The State's interest in protecting both children and the rights of all parties is best served by the appointment of counsel for indigent parents. Indeed, as the State acknowledges, "it would be a waste of the State's resources to place children out of the home or provide services that are unnecessary." The participation of counsel on behalf of all parties in abuse or neglect proceedings is essential to the fair and efficient administration of justice and the proper resolution of potentially life-changing issues.

The fiscal and administrative burden associated with providing counsel for indigent parents in State-initiated abuse or neglect hearings is "hardly

significant enough to overcome private interests as important as those here." *Lassiter*, 452 U.S. at 28. In fact, the cost to the State does not present a *new* burden, as it successfully met this expense for over thirty years under the prior statute. Moreover, the prior statute recognized that accused parents stand on a different footing than do unaccused parents and parents seeking guardianship termination. *See Father 2006-360*, 155 N.H. at 97 (providing court-appointed counsel to all unaccused, noncustodial parents in abuse or neglect proceedings would place a substantial fiscal as well as administrative burden upon the State); *Brittany S.*, 147 N.H. at 493 (costs associated with providing representation for indigent parents in proceedings to terminate a guardianship could be significant).

Furthermore, the appointment of counsel for an indigent parent incident to the State's filing an abuse or neglect petition is both judicially and financially economical. "Judicial economy is achieved by the early appointment of counsel in that the case can then be promptly heard at its various stages with the expectation that all of the parties will be fully advised of the applicable procedures and possible results. . . . Financial economy follows from the true achievement of judicial economy." *Matter of Lindsey C.*, 473 S.E.2d 110, 124 (W.Va. 1995); *see* Abel, *Keeping Families Together, Saving Money, and Other Motivations Behind New Civil Right to Counsel Laws*, 42 LOY. L.A. L. REV. 1087, 1093 (2009) (providing parents with counsel earlier in dependency-neglect cases would both reduce litigation costs and eliminate the need to pay for the foster care of wrongfully taken children).

The case-by-case approach to the appointment of counsel adopted by the plurality is not, in my opinion, sufficient to protect the interests at stake. Relying upon a review of the record to determine whether an indigent parent should have been provided counsel "at most will show the obvious blunders and omissions of the defendant parent. Determining the difference legal representation would have made becomes possible only through imagination, investigation, and legal research focused on the particular case." *Lassiter*, 452 U.S. at 51 (Blackmun, J., dissenting). "Even if the reviewing court can embark on such an enterprise in each case, it might be hard pressed to discern the significance of failures to challenge the State's evidence or to develop a satisfactory defense." *Id.* "Because a parent acting *pro se* is even more likely to be unaware of controlling legal standards and practices, and unskilled in garnering relevant facts, it is difficult, if not impossible, to conclude that the typical case has been adequately presented." *Id.* Furthermore, such an approach

> places an even heavier burden on the trial court, which will be required to determine in advance what difference legal representation might make. A trial judge will be obligated to examine the State's documentary and testimonial evidence well before the

hearing so as to reach an informed decision about the need for counsel in time to allow adequate preparation of the parent's case.

*Id.* at 51 n.19.

Taking full account of the fundamental and constitutional right of parents to the custody and control of their children, the grievous nature of the risk of an erroneous deprivation of this right, the imbalance of power parents face against the State, and the governmental interest in protecting the rights of all parties, notwithstanding the financial cost to do so, I would hold that the due process protections contained in the New Hampshire Constitution require that indigent parents be represented by appointed counsel at State-initiated abuse or neglect proceedings under RSA chapter 169-C.