NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by email at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: https://www.courts.nh.gov/our-courts/supreme-court

THE SUPREME COURT OF NEW HAMPSHIRE

_____

3rd Circuit Court-Ossipee Family Division
No. 2022-0533


IN RE J.H.

Argued: April 27, 2023
Opinion Issued: November 14, 2023


John M. Formella, attorney general, and Anthony J. Galdieri, solicitor general (Laura E. B. Lombardi, senior assistant attorney general, on the memorandum of law and orally), for the New Hampshire Division for Children, Youth and Families.


The Young Law Firm, of Conway (Robert Young on the brief and orally), for the mother.


BASSETT, J. The respondent, the mother of J.H. (Mother), appeals the order of the Circuit Court (Boyle, R., approved by Greenhalgh, J.) finding that she neglected her son, J.H. See RSA 169-C:3, XIX(b) (2022). On appeal, Mother argues that the trial court erred because, as a matter of law, she could not be found neglectful when another person was the legal guardian of J.H. In the alternative, she contends that the evidence in the record is insufficient to support the neglect finding. We affirm.

The record supports the following facts. J.H. is a fourteen-year-old boy who has developmental delays and who has suffered significant trauma. In 2016, when J.H. was approximately eight years old, J.H.'s grandmother petitioned for guardianship over him due to the poor care he was receiving from his parents. The circuit court granted the guardianship petition, and J.H. resided with his grandmother (the Guardian) for approximately six years until May 2022.

On May 2, 2022, J.H. and the Guardian's live-in boyfriend had an altercation during which the boyfriend put his hands around J.H.'s neck and pushed him up against a wall. The next day, J.H. disclosed this incident to a family service provider, who then reported the incident to the New Hampshire Division for Children, Youth and Families (DCYF). DCYF investigated the report and established a safety plan with which the Guardian agreed. However, the Guardian was ultimately unable to comply with the safety plan. DCYF contacted J.H.'s father (Father), but he was unable to take custody of J.H. DCYF attempted to contact Mother but was unsuccessful. DCYF then requested an emergency ex parte order to remove J.H. from the Guardian's home. See RSA 169-C:6-a, I (2022). On May 4, the court granted that request, giving DCYF protective supervision of J.H. See RSA 169-C:3, XXV (2022) (defining "[p]rotective supervision"). DCYF then placed J.H. in a residential treatment facility.

On May 6, DCYF made contact with Mother by phone. A Child Protective Service Worker (CPSW) explained to Mother what had happened to J.H. and that DCYF intended to file neglect petitions. Mother responded that she had not spoken to J.H. in seven years and that her relationship with J.H. was strained because he had abused one of her other children. Additionally, Mother had recently had a baby and she worried that taking custody of J.H. would put her baby at risk of being abused. Mother also reported that, at the time, she was staying with friends and preparing to move into a homeless shelter. Mother told the CPSW that she was not "able or willing" to take J.H. and did not offer any alternative caregivers. DCYF ultimately filed neglect petitions against Mother, Father, and the Guardian. See RSA 169-C:3, XIX(b).

Following a two-day evidentiary hearing, the circuit court found that Mother, Father, and the Guardian had neglected J.H. It concluded that neither of J.H.'s parents was "able or willing to provide proper parental care or control of the child and . . . the deprivation [was] not due primarily to the lack of financial means of the parents." With respect to Mother, the court found that she "was unable or unwilling to take the child as she did not have stable housing and had not even spoken to the child in approximately 7 years." The court awarded DCYF legal custody of J.H. and later issued a dispositional order, which outlines the objectives Mother must meet in order to reunify with

J.H. This appeal followed. Our review of the circuit court's order is limited to its neglect finding relative to Mother.

When reviewing a finding of abuse or neglect, we will sustain the findings and rulings of the trial court unless they are unsupported by the evidence or tainted by error of law. In re N.T., 175 N.H. 300, 311 (2022). We defer to the court's assessment of the evidence and view the facts in the light most favorable to the court's decision. Id.

We turn first to Mother's argument that the court's neglect finding was tainted by error of law because she could not, as a matter of law, be found neglectful while the guardianship remained in effect. Relying on RSA 463:12 (2018), Mother asserts that the Guardian stood in her stead as the person responsible for J.H.'s well-being and, therefore, she was not required by law to care for J.H. In essence, Mother contends that the guardianship "absolved" her of her parental responsibilities. DCYF counters, relying on RSA 463:13 (2018) and RSA 169-C:3, XXVII (2022), that a guardianship does not relieve a parent of all parental rights and obligations and that Mother retained a parental duty to provide safe shelter to J.H. when the Guardian failed to do so. We agree with DCYF.

Resolving the parties' dispute requires that we engage in statutory interpretation. Statutory interpretation presents a question of law, which we review de novo. In re Guardianship of B.C., 174 N.H. 628, 631 (2021). When construing a statute, we first examine the language of the statute, and, if possible, construe that language according to its plain and ordinary meaning. Id. We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include. Id. We construe all parts of a statute together to effectuate its overall purpose and avoid an absurd or unjust result. Id. When interpreting two statutes that deal with a similar subject matter, we construe them so that they do not contradict each other, and so that they will lead to reasonable results and effectuate the legislative purpose of the statutes. In the Matter of Chrestensen & Pearson, 172 N.H. 40, 43 (2019).

Under RSA 463:12, I, except as otherwise expanded or limited by statute or court order, "a guardian of the person of a minor has the powers and responsibilities of a parent regarding the minor's support, care and education." These responsibilities may include taking custody of the minor and establishing where the minor lives. See RSA 463:12, III(b). However, notwithstanding the existence of a guardianship over the child, the parents retain certain residual rights and duties to the child, which are recognized in both the guardianship statute, see RSA ch. 463 (2018 & Supp. 2022), and the Child Protection Act, see RSA ch. 169-C (2022 & Supp. 2022). Both statutory schemes recognize the residual parental right of visitation with the child and

the parental responsibility of support during a guardianship.  See RSA 463:13, I, III; RSA 169-C:3, XXVII.  The Child Protection Act sets forth additional residual parental rights and responsibilities.  See RSA 169-C:3, XXVII.  Accordingly, the grant of a guardianship of a minor to a person other than a parent does not extinguish all parental rights and duties.  See In re Guardianship of Nicholas P., 162 N.H. 199, 205 (2011) (observing that the appointment of a guardian does not "remove[] the entire bundle of parental rights" (quotation omitted)).

Parental responsibilities come in many forms, including providing for the child's physical and emotional needs.  In re Adam M., 148 N.H. 83, 84 (2002).  Some parental duties may be discharged by delegation.  Id.  The relevant parental responsibility here is the duty to provide the child with safe shelter.  See In re M.M., 174 N.H. 281, 296 (2021).  We have held that, when a parent is informed that her or his child lacks safe shelter, the parent's unwillingness or inability to provide the child with shelter, or to delegate that duty to another, constitutes neglect.  See id. at 296-97 (affirming neglect finding when, after father was notified that child was ready to be discharged from hospital, he refused to take custody of child or arrange a safe place for the child to go); In re G.B., 174 N.H. 575, 581-82 (2021) (similar).  Here, the parties disagree as to whether Mother continued to have a parental duty to provide safe shelter notwithstanding the existence of the guardianship.

We look to the language and purpose of both the Child Protection Act and the guardianship statute to resolve this question.  See Chrestensen, 172 N.H. at 43.  The Child Protection Act defines "[r]esidual parental rights and responsibilities" as "those rights and responsibilities remaining with the parent after the transfer of legal custody or guardianship except guardianship pursuant to termination of parental rights, including, but not limited to, right of visitation, consent to adoption, right to determine religious affiliation and responsibilities for support."  RSA 169-C:3, XXVII (emphases added).  Ordinarily, when the legislature uses the phrase "including, but not limited to" in a statute, we apply the statutory interpretation principle of ejusdem generis.  See State v. Moore, 173 N.H. 386, 391-92 (2020).  Under this principle, when specific words in a statute follow general ones, the general words are construed to embrace only persons or things similar in nature to those enumerated by the specific words.  See id. at 392.  When applying this principle, we are often able to discern a common theme or character of the specific enumerated words, which aids our interpretation of the more general word or words.  See, e.g., id. (enumerated list of services compensable under restitution statute were all healthcare services); In the Matter of Clark & Clark, 154 N.H. 420, 423 (2006) (explaining that the enumerated sources of "gross income" for child support purposes share two characteristics).

4

Here, however, we are unable to discern a unifying characteristic shared by the residual parental rights and responsibilities listed in RSA 169-C:3, XXVII.  We therefore find the principle of ejusdem generis unhelpful in this instance.  See State v. Small, 99 N.H. 349, 351 (1955) (observing that the rule of ejusdem generis "is neither final nor exclusive" and serves only as a tool — not an edict — in ascertaining legislative intent).  We instead look to the purposes of both of the statutory schemes at issue and construe the statutory language in light of those purposes.  See Chrestensen, 172 N.H. at 43; see also Small, 99 N.H. at 351 (explaining that ejusdem generis "is always subject to the qualification that general words will not be used in a restricted sense if the act as a whole indicates a different legislative purpose in view of the objectives to be attained").

Both statutes express legislative intent to prioritize the best interests of the child.  See RSA 169-C:2, I (2022); RSA 463:1 (2018).  Moreover, both statutes express legislative intent that a child should, when possible, remain in his "own home" or "home community."  RSA 169-C:2, II, III(b) (2022); RSA 463:1.  In other words, the statutes express legislative preference for in-home placements over out-of-home placements — placements "with someone other than the child's biological parent or parents, adoptive parent or parents, or legal guardian."  RSA 169-C:3, XX-a (2022).  Recognizing a residual parental duty to provide for the minor's basic shelter in the event that a legal guardian fails to do so furthers the statutory purposes by providing the child an opportunity for a "home" placement.  See RSA 169-C:2, II, III(b); RSA 463:1; cf. RSA 169-C:6-a, I (requiring, before emergency removal of child and placement in foster care, that DCYF inform court of efforts to locate non-custodial parent or other relatives for temporary placement).

Recognizing such a residual parental duty is also consistent with the plain language of the guardianship statute.  The statute requires a guardian to "[b]ecome or remain personally acquainted with" and "maintain sufficient contact with the minor," RSA 463:12, II(a), and permits, but does not require, the guardian to take custody of the minor and establish where the minor will live, RSA 463:12, III(b).  The statute thus contemplates that someone other than the guardian may have physical custody of the minor, which could include the parent or parents.  See RSA 463:12, II-III; RSA 463:1 (recognizing that interests of a minor are "generally best promoted in the minor's own home"); cf. B.C., 174 N.H. at 632 (concluding that a "guardianship may, in some instances, exist concurrently with an award of legal custody to another individual or entity").  The fact that a guardian appointed under RSA chapter 463 does not automatically receive physical custody of the minor supports the notion that a parent retains a residual parental responsibility to provide the child safe shelter if and when the guardian is unable or unwilling to do so.  In light of the language of RSA 169-C:3, XXVII, RSA 463:12, and RSA 463:13 and the shared purposes of both statutory schemes, we conclude that the

legislature intended that parents retain a residual parental responsibility — after receiving actual notice that the child's guardian is unable or unwilling to provide the child basic shelter — to take physical custody of the child or otherwise ensure that the child has a safe place to go.

We are not persuaded by Mother's arguments to the contrary. First, Mother argues that In re Faith T., 165 N.H. 346 (2013), supports the proposition that the guardianship relieved her of her parental duty to provide J.H. basic shelter. Faith T. did not involve an appeal of a neglect finding; rather, it concerned the interpretation of one statutory basis for the termination of parental rights. See Faith T., 165 N.H. at 348-49; RSA 170-C:5, II (Supp. 2022). In Faith T., we explained that, under RSA 170-C:5, II, "'when legal custody [of the child] is lodged with others,'" a parent can have her parental rights terminated if, although financially able, she neglects to pay for the child's "'subsistence, education or other care necessary for [the child's] mental, emotional, or physical health.'" Faith T., 165 N.H. at 348 (quoting RSA 170-C:5, II (2002)) (emphasis omitted). We observed that, on the other hand, a parent cannot have her parental rights terminated under RSA 170-C:5, II based upon a failure to provide for or manage the "care necessary for the child[]'s 'mental, emotional, or physical health'" because such care "is the province of those in whom legal custody is lodged." Id. In Faith T., however, we had no occasion to consider whether a parent's failure to provide necessary care — when the person with legal custody of the child has failed to provide necessary care — constitutes neglect under RSA chapter 169-C. See id. at 348-49; see also In re C.M., 163 N.H. 768, 774 (2012) (discussing the differences between abuse and neglect proceedings and proceedings to terminate parental rights). Accordingly, we disagree with Mother's contention that Faith T. controls here.

Mother next asserts that reunification with J.H. "under RSA 169-C:23 cannot even happen because the RSA 463 guardianship is still in place." Even if we assume that the guardianship is a barrier to future reunification with Mother, that does not undermine the residual parental responsibility recognized herein: when contacted by DCYF about the Guardian's inability to provide shelter, Mother had a duty to take custody of J.H. or otherwise ensure he had safe shelter. Additionally, we note that J.H.'s reunification with Mother is not the only possible outcome of this neglect proceeding, see RSA 169-C:24-a, III(a) (2022); RSA 169-C:24-b, II(a) (2022), and that, if Mother wishes to reunify with J.H., there are avenues by which the guardianship can be terminated, see RSA 463:15, IV (2018) (termination of guardianship); see also In re O.D., 171 N.H. 437, 438-39 (2018) (observing that, after children were found to be neglected, court terminated grandmother's guardianship over the children "at DCYF's request").

6

In sum, we conclude that, notwithstanding the existence of a guardianship over a child, parents retain certain residual parental rights and responsibilities as a matter of law. Those residual responsibilities include the duty to take physical custody of the child or otherwise ensure that the child has a safe place to go after the parent receives actual notice that the child's guardian is unable or unwilling to provide the child basic shelter. Because, as a matter of law, Mother owed that residual parental duty to J.H., we conclude that the trial court did not err when, notwithstanding the existence of the guardianship, it found that Mother had neglected J.H.

Mother next asserts that the court's neglect finding was unsupported by the evidence, see N.T., 175 N.H. at 311, for two reasons: DCYF did not offer the final guardianship order into evidence; and DCYF failed to prove that the neglect was not due primarily to her lack of financial means. Turning to Mother's first sufficiency argument, she posits that it is possible that the guardianship order prevents her from having contact with J.H., which would have posed a legal and practical barrier to her ability to fulfill her residual parental duty. Accordingly, she asserts that DCYF could not meet its burden of proving she neglected J.H. without providing the final guardianship order and demonstrating that she could have contact with J.H.

We decline to address the merits of this argument because Mother did not adequately preserve it for our review. Parties generally may not have judicial review of matters not raised in the trial forum. Dukette v. Brazas, 166 N.H. 252, 255 (2014). It is Mother's burden, as the appealing party, to demonstrate that she specifically raised before the trial court the arguments articulated in her brief. Id. Although Mother's counsel questioned the CPSW at the hearing about her knowledge, or lack thereof, of the final guardianship order, counsel did not raise any argument in closing based upon the absence of the final guardianship order from the record. Nor does the appellate record contain a motion for reconsideration. Accordingly, Mother has failed to demonstrate that she preserved this argument. See id.

Finally, we turn to Mother's argument that the record contains insufficient evidence that the neglect was not due primarily to her lack of financial means. She asserts that, because DCYF did not investigate her financial status, it could not meet its burden of proof. We disagree.

As relevant here, a "[n]eglected child" is defined as a child:

(b) Who is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health, when it is established that the child's health has suffered or is likely to suffer

7

serious impairment; <u>and the deprivation is not due primarily to the lack of financial means of the parents, guardian, or custodian</u> . . . .

RSA 169-C:3, XIX(b) (emphasis added). "Statutory neglect is not the actions taken or not taken by the parent or parents"; rather, "it is the likelihood of or actual serious impairment of the child's physical, emotional, and mental well being that are the conditions of neglect that must be repaired and corrected in the circuit court process." <u>G.B.</u>, 174 N.H. at 581 (quotation and brackets omitted). DCYF bears the burden of proving neglect allegations by a preponderance of the evidence. <u>See</u> RSA 169-C:13 (2022).

Under RSA 169-C:3, XIX(b), DCYF must satisfy this burden by showing, by a preponderance of the evidence, that any deprivation of parental care or control was "not due primarily to the lack of financial means of the parents, guardian, or custodian." RSA 169-C:3, XIX(b); <u>see also</u> <u>In re H.B.</u>, 175 N.H. 592, 595 (2023). In other words, DCYF must prove that a lack of financial means was not the "primary cause" of the neglect. <u>H.B.</u>, 175 N.H. at 595 (emphasis omitted). In <u>H.B.</u>, we rejected the proposition that DCYF must always put on evidence of the parents' financial status in order to meet this burden. <u>Id</u>. Instead, we explained, DCYF can meet its burden of proving that a lack of financial means <u>was not</u> the primary cause of neglect by "[p]roviding evidence that the parents do not lack financial means" or "by proving that something else, unrelated to the parents' financial means, <u>was</u> the primary cause." <u>Id</u>.

The record here demonstrates that DCYF proved, by a preponderance of the evidence, that "something else, unrelated to [Mother's] financial means," <u>id</u>., was the primary cause of the neglect. The CPSW testified that she spoke with Mother on the phone for approximately twenty to thirty minutes. During that conversation, Mother indicated that she was currently living with friends and would soon be moving into a homeless shelter, but Mother "did not say she was not financially able to take" J.H. In fact, the CPSW testified that, if the only barrier to Mother taking custody of J.H. had been her lack of stable housing or her financial means, the CPSW "would have had a conversation [with Mother] and talked about how that could happen." Instead, the barriers that Mother identified as preventing her from taking custody of J.H. were her strained and distant relationship with J.H. and his past abuse of other children. Mother's testimony was, to some extent, consistent with the testimony of the CPSW. Mother testified that when the CPSW asked her if she could take J.H., she declined because of her "rough relationship" with J.H., which was based on his history of victimizing other children. Mother also testified that she and the CPSW talked more about her relationship with J.H. and the fact that she had a newborn in her care than they discussed her living situation.

8

This evidence is sufficient to establish, by a preponderance of the evidence, that Mother's relationship with J.H. and J.H.'s past behavior — not Mother's financial status — were the primary reasons that Mother declined to take J.H. into her care and J.H. was thereby neglected. We therefore conclude that the record supports the trial court's finding that Mother's failure to provide proper parental care or control of J.H. was "not due primarily to" Mother's "lack of financial means." RSA 169-C:3, XIX(b); see also N.T., 175 N.H. at 311.

In sum, we hold that, despite the existence of a guardianship over the child, a parent retains a residual responsibility to provide safe shelter for the child when informed that the guardian is unable or unwilling to do so. We also determine that there was sufficient evidence to support the court's finding that the neglect was not due primarily to Mother's lack of financial means. Accordingly, we conclude that the trial court did not err when it found that Mother neglected J.H.

Affirmed.

MACDONALD, C.J., and HICKS, HANTZ MARCONI, and DONOVAN, JJ., concurred.